Mary Ellis Turner v. Commissioner.
Turner v. Commissioner
Docket No. 92011.
United States Tax Court
T.C. Memo 1964-195; 1964 Tax Ct. Memo LEXIS 141; 23 T.C.M. (CCH) 1186; T.C.M. (RIA) 64195; July 17, 1964
*141 Petitioner resided on a farm from 1946 to the time of trial, including the taxable years 1956 through 1959, inclusive, involved herein. Virtually all of her time was devoted to varied and arduous activities on said farm, such as raising agricultural products, horses, cattle, and boarding dogs. Petitioner sustained substantial loses during the entire period in which she operated the farm, including the years in issue. Held: That the losses which petitioner incurred during the taxable years in question are deductible as losses incurred in the operation of a trade or business within the intendment of sec. 162, I.R.C. 1954. Sidney B. Gambill, 747 Union Trust Bldg., Pittsburgh, Pa., and James E. Mayer, for the petitioner. Hobart Richey, for the respondent. FISHER
Memorandum Findings *142 of Fact and Opinion FISHER, Judge: Respondent determined deficiencies in income tax of petitioner for the years and in the amounts as follows: Year Ended
Deficiency
December 31, 1956
$17,028.07
December 31, 1957
15,601.46
December 31, 1958
14,403.31
December 31, 1959
12,348.79
Total
$59,381.63
The issue presented for our consideration is whether the losses which petitioner sustained during the taxable years 1956 through 1959, inclusive, are deductible as losses incurred in a trade or business within the purview of section 162 of the 1954 Code. Petitioner also claimed net operating loss carryover deductions for the years 1956 and 1957. In addition, she deducted certain other items totaling $194.60 for 1958 and $189.13 for 1959. The parties have agreed that the net operating loss carryovers and the additional items will be allowed as deductions only if it is determined that petitioner was in a trade or business. Findings of Fact Some of the facts have been stipulated and, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner is an individual residing at Bryn Ayron, Ebensburg, Cambria County, Pennsylvania. *143 She filed her individual Federal income tax returns for the years 1956 through 1959 with the district director of internal revenue, Pittsburgh, Pennsylvania. Petitioner kept her books and filed her income tax returns on the calendar year basis and on the cash receipts and disbursements method of accounting. Petitioner was born in Johnstown, Pennsylvania, where she lived until she was 18 years of age. She then entered Goucher College and was graduated in 1926. Thereupon she entered Johns Hopkins Medical School where she completed her studies to become a medical doctor but did not receive a degree. She became an instructor of urology at the Brady Urological Institute of Johns Hopkins Hospital and Medical School and remained there until 1945. Petitioner's research involved work on organisms of the genitourinary tract, streptococci, gonococci and staphylococci. She was awarded a Government research grant during World War II and in connection therewith conducted additional experimental research at the Federal prison in Terre Haute, Indiana. Petitioner's father was a banker in Johnstown who helped to finance the start of the Johnstown Publishing Company, which publishes a newspaper *144 and, in addition, now operates a television station in that city. He died in 1911, leaving stock in that company to petitioner's mother. When her mother died in 1936, petitioner inherited the stock jointly with her two sisters, Mrs. W. S. Mayer of Johnstown and Mrs. K. C. Bieneman of Baltimore. During the years 1939 through 1941, while employed full time at Johns Hopkins Hospital and Medical School, petitioner operated a riding academy located on the outskirts of Baltimore. At the academy she boarded horses, rented horses to riders and gave riding instructions. Each morning she went to the stables, worked there until 8 a.m., and then went to the hospital. She did not return to the stables in the afternoons except on Saturdays and Sundays. Petitioner continued to operate the stables until she was compelled to give them up on account of the gasoline shortage during World War II. In 1945 or 1946 petitioner gave up her work at Johns Hopkins and came to Bryn Ayron to live. At that time she suffered from a respiratory disease or bronchial trouble and thought a few years away from the city atmosphere might relieve this condition. Bryn Ayron, as the residence is known, was built near *145 Ebensburg on the farm of her uncle, Ben Jones. Her father built it as a summer cottage for the family which lived in Johnstown some 18 miles away. On coming to Bryn Ayron, petitioner operated the farm which consists of a grouping of several tracts of land, title to which is held as an undivided interest by petitioner and her two sisters. The sisters inherited the land from their mother. Petitioner's interest is approximately 30 percent of the total acreage of 176.2 acres. She leases her sisters' interests in the farm. The farm consisted of not more than 55 acres of cultivation and 30 acres of pasture land. Prior to the time petitioner operated the farm, it had been operated as a Grade A dairy farm by a tenant farmer who left to buy his own farm on which to engage in dairy farming. When petitioner left Baltimore and came to live on the farm she brought with her two horses she had owned in Baltimore. She had been informed by people in the area that she could make a living raising and selling horses and renting out stables to people in the surrounding territory. She built a stable having five box stalls, two foaling stalls and a room for the storage of feed. In front of the stable *146 is an exercising ring for the horses. Petitioner purchased a mare for $750 in 1946 and a mare and foal for $1,540 and two colts for $790 in 1947. Petitioner experienced several unusual casualties in connection with her horse raising. One mare was electrocuted when she stepped on a live electric wire, one horse developed a nervous disease, another ran into the side of a fence and broke her back and still another horse was so injured while being loaded on a truck that its sale was impossible. In 1951 and 1952, petitioner realized she was having abnormal losses with her horses. The business of selling horses had changed and people began to use them less after World War II. Petitioner sent horses to a farm in Rolling Rock and to a hunt club in Altoona to be trained and sold. She believed that if she had these horses trained they would bring good prices. She was able to sell only two of these horses, however. Between 1950 and 1957 petitioner was able to sell only eight colts. The buying public was no longer interested in her type of horses. At the time of trial she still had five horses on the farm. Petitioner's horse boarding expenses during 1958 and 1959 were $8,336.58 and $5,039.70, *147 respectively. About 1948 petitioner had a pedigree German shepherd dog for a guard dog around her home. She was approached by friends with the idea that she should raise German shepherd dogs for sale to the Army. Thereupon, she constructed kennels and started raising dogs and boarding dogs for people in the surrounding territory. Petitioner thought that boarding dogs could be lucrative. The basement under her home had a dirt floor when she moved to the farm. The floor was concreted and equipped with dog runs, a washer, and a deep freeze for storing dog meat and her own personal supplies. There is an entrance to the basement from outside and the dogs were brought from the kennel runway into the basement at night during the winter months and in bad weather. The wire enclosed kennel runways are within 25 to 50 feet from the residence and extend back a distance of 150 feet. Petitioner was the only person in the area who maintained boarding kennels for dogs. Pedigree records were kept on the German shepherd dogs for registration purposes. In order to sell them it was necessary that they be registered. Petitioner sold her dogs to the United States Army, for seeing eye dogs, to various *148 police departments and to neighbors. She also raised Siamese cats for sale. Petitioner sold the following number of dogs and cats between the years 1950 and 1959, inclusive: Year
Dogs
Cats
1950
41
17
1951
70
0
1952
25
10
1953
58
5
1954
24
0
1955
49
0
1956
28
0
1957
37
4
1958
26
10
1959
45
5
Petitioner found her training to be very helpful in dog breeding because of her knowledge of diseases and her interest in reproduction. She was interested in breeding characteristics of the dogs as well as their diseases, especially in a hip problem called "big dog disease" to which 90 percent of all German shepherds are susceptible. Because of this hip disease, it became necessary to x-ray each dog to determine if such disease was present before the dog was sold. Petitioner, however, did not find that she was prevented from selling her dogs because of the hip disease since there are various grades in the effect of the disease. She did take back dogs which were lame, however. Petitioner made efforts to breed her German shepherds in a manner designed to eliminate this disease but met with little or no success in eliminating the problem. *149 During the period from 1950 to 1959, inclusive, more German shepherds were produced each year throughout the country and the price per dog frequently dropped. A breeder who maintained his integrity, however, could get a good price. The price depended on the dog. Some sold for $85 or $100 and others for as much as $250. During the years 1958 and 1959, petitioner had direct dog expenses of $15,290.59 and $15,361.84, respectively, before any allocation of overhead expenses to dogs. During the taxable years 1958 and 1959, petitioner had income from dogs, including boarding, sales and stud fees, of $2,599.75 and $1,815.90, respectively. When petitioner went to the farm it was equipped with two barns, one of which was a large cattle barn. She decided to go into the business of raising Black Angus beef cattle. She purchased five cows in July 1951 for $1,230. These cows gave birth to their calves in 1952. She also purchased highbred bulls from farms in the business of raising breeding stock. At the time petitioner decided to raise cattle, she knew that the farm had never been operated for that purpose but had been a successful Grade A dairy farm. Petitioner purchased no additional *150 cows for her herd after 1951. She relied solely on the natural increase method of increasing her herd. Petitioner, because of her medical training and work with horses and dogs, possessed knowledge concerning selective breeding and other genetic problems. This was one of the reasons she was attracted to the natural increase method of building her herd. She knew she could increase the size of her herd more quickly by purchasing cows rather than following the natural increase method. Petitioner had a very low loss rate by death of her calves and at the time of trial her herd contained 47 cows, 21 heifers, 1 calf and 2 bulls. She relied upon the determinations made by the Pennsylvania State University in deciding which cattle should be sent to market. Petitioner saved the best cows from the herd for use by 4-H Clubs. Petitioner did not make a profit on her cattle operation in any of the taxable years here involved. The income realized, the expenses incurred, and the losses sustained in operating the farm from 1946 to 1959 were as follows: Year
Income
Expenses
Losses
1946
None
$ 8,047.20
$ 8,047.20
1947
$ 839.00
16,864.08
16,025.08
1948
807.00
20,939.23
20,132.23
1949
526.00
16,842.38
16,316.38
1950
1,967.58
18,576.69
16,609.11
1951
4,266.43
21,433.87
17,167.44
1952
5,732.80
18,920.98
13,188.18
1953
3,253.16
20,249.88
16,996.72
1954
5,395.11
30,712.42
25,317.31
1955
4,659.16
28,449.20
23,790.04
1956
7,655.14
42,168.92
34,513.78
1957
6,126.51
35,311.59
29,185.08
1958
5,739.91
42,345.40
36,605.49
1959
5,309.07
38,400.76
33,091.69
*151 The income was from the sale of horses, cattle, dogs and cats, vegetables, wood, grain, hay, dog breeding and boarding fees, rent, soil conservation payments by the Government, and miscellaneous receipts. The expenses included labor, rent, feed, supplies, repairs, fertilizer, seed, soil and water conservation, machine hire, veterinarian, horseshoeing, breeding fees, gasoline, automobile expenses, utilities, periodicals, advertising, show entries, registration fees, horse boarding fees, taxes, licenses, interest, travel, legal and accounting, depreciation, insurance, loss on sale of livestock and other miscellaneous expenses. Petitioner's income for the years 1946 to 1959, outside of her farming operations, was as follows: Long-term
Real Estate
Partnership
Cap-
Johnstown
Total Divi-
Interest
ital Gains
Rental
Dolau Ayron
Trib-
Year
une Dividend
dend Income
Income
Reported
Partnership
Farm
1946
Not
$14,604.62
$1,410.70
$1,486.44
($ 251.41)
classified
1947
Not
11,582.55
506.27
120.10
( 317.08)
($ 30.79)
classified
1948
Not
12,247.64
433.49
122.63
( 3,159.54)
( 135.09)
classified
1949
Not
9,551.88
307.20
186.71
17.33
( 135.33)
classified
1950
$ 9,000.00
9,546.40
60.58
1,024.30
( 91.66)
1951
13,475.00
14,002.45
121.16
265.38
( 155.64)
1952
11,500.00
12,227.50
2,297.27
( 417.66)
1953
12,000.00
12,932.50
( 1,006.83)
( 188.03)
1954
17,380.00
17,944.09
3,505.65
3,435.18
( 278.50)
1955
23,700.00
24,184.09
3,848.71
( 305.66)
1956
36,340.00
36,876.69
265.70
4,962.75
( 322.71)
1957
36,340.00
36,834.55
8.00
5,274.68
( 87.72)
1958
30,590.00
31,112.00
6.00
5,751.48
1.92
1959
27,265.00
27,787.00
6.00
97.00
6,736.68
( 420.69)
*152 Petitioner equipped the farm with the following complement of farm equipment: 2 tractors, 1 truck, Jeep, baler, feed mill, scales, disc harrows, plows, manure spreader, etc. She has always employed people to assist her in running the farm. Beginning in 1950 she employed a neighbor farmer who lost his barn in a fire and was unable to continue his own business. He has since retired. One of his sons worked for petitioner during vacations. He took courses in agriculture at Pennsylvania State University and now works full time for her. In 1957 she employed a one-armed man who occupies the only tenant house on the farm. He has a family of six children and petitioner employs his older boys in the summer time, on weekends and after school. Petitioner was guided in her farm operation by county, state and Federal authorities, as well as the Extension Service of the Pennsylvania State University. Taking their guidance, she plowed her farm in contour strips, had her soils tested, engaged in the Federal Soil Conservation Program, used the recommended fertilizers and lime, planted new grasses and drained the swampy spots. Her local county soil agent wrote her the following letter on January 5, 1960: *153 Mrs. Mary E. Turner, Ebensburg, RD, Penna. Dear Mrs. Turner: An examination of your beef cattle operation shows that you are making good progress. It is difficult to show results by starting with a few females and building up. This method has the advantage of requiring the least amount of capital outlay. The disadvantage is the time it takes to build up the cow herd. To build the quality that you are doing also lengthens the time element because of culling the poorer females. In a few years you will probably reach a maximum carrying capacity for the land. You will be able to cull your cow herd more closely at that time. This should result in a more uniform herd. It will also mean that the bulls will be used to more advantage. Their expense per cow will be less. Your field program will show the results more readily as you reach the carrying capacity of the pastures. The lime and fertilizer program has been expensive but it will pay off. An average figure is 1 1/2 acres of pasture for a cow and calf. I believe you can get along with less because of the lime and fertilizer that has been applied. Of course it will be necessary to continue this feeding program. The new field *154 that will be seeded to birdsfoot trefoil with a little luck, should help the carrying capacity. This land preparation and seed is expensive and it will take three or four years to realize a return from this pasture. Once it gets going, I am sure the birdsfoot pasture will be one of the most productive. You may want to consider the other pastureland being converted to this legume. Labor is a big expense for you. Here again as you reach a more economical unit, the labor will be a smaller per cent of expense. From the labor angle, you are making the best use of your land. Dairy which would be an alternative enterprise, requires a greater investment and much more labor. In some research findings, it took five times as much labor for dairy as it did for a beef operation. The question of purebreds versus grades often comes up in discussing beef cattle. Here you can consider your operation very practical. With grades you are producing cattle for direct consumption. The purebred breeder has a much greater investment in cattle. His expense for advertising is very high. Showing cattle is necessary and expensive advertising. A small percentage of the breeders ever hit a breeding combindation *155 [combination] that will really pay off. In the few years that you have had the cattle operation I believe you are well under way toward a practical operation. It will probably take a few more years of building until you can see a financial gain. Let me congratulate you on having produced the calf that went on to win the 4-H Baby Beef Contest. We appreciate your letting the 4-H members have the first pick of your steer calves this fall. This helps our youth program and makes it stronger in the county. If I can be of further service, please feel free to call upon me. Very truly yours, /s/ H. C. Terndrup H. C. Terndrup County Agent HCT:r During the years petitioner was engaged in her farm activities, she sold interest producing assets in order to obtain additional funds for her enterprise. During the taxable years involved herein, petitioner owed the Bank of Ebensburg between $40,000 and $60,000, which was borrowed for use in connection with her farm because of the substantial losses incurred. Since petitioner moved to the farm she has lived alone in the residence and has been away from it only three times except for occasional overnight absences. During this period *156 she spent a month in Canada, two weeks in Florida and took a six-weeks cruise. Other than occasional family picnics, attended by her daughter, grandchildren and other relatives, she has never entertained at the farm. On one occasion the Pennsylvania Angus Raisers, about 250 people, visited to see the workings of a small farm. The farm as a whole has the physical appearance of an ordinary farm being carried on as a business. The farmhouse occupied by petitioner is of frame construction. The basement contains a furnace and there are enclosures for dogs on all four sides. On the first floor there are three rooms and a bath, a living room and a dining room. There has been no dining table in the dining room for about 10 years before the time of the instant trial. The dining room is completely occupied by office furniture, an adding machine, stamping machine, filing cabinets, desks, typewriters, mimeograph machine and office paraphernalia. There are bedrooms on the second floor of the house. Petitioner's farming operations during the years in question constituted a carrying on of a business entered into with expectation of profit. Opinion The only issue to be determined is whether *157 the losses suffered by petitioner during the taxable years 1956 through 1959 are deductible as losses incurred in a trade or business entered into for profit. Respondent contends that petitioner operated the farm for her own personal reasons. In support of this contention, respondent asserts that petitioner derived considerable personal satisfaction from engaging in work with animals; that she engaged in such work with no interest, desire or need for making a profit and that she was not at any time operating her farm for profit. In addition, respondent points to the recurrence of losses as indicative of the fact that the farm was not operated as a business. Petitioner's position is that her farming operations constituted the carrying on of a business and was not an activity for recreation or personal pleasure. Section 162 of the Code of 1954 allows as a deduction all of the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. [1]
Regulations section 1.162-12 sets forth in detail the deductions permitted by *158 a farmer engaged in a trade or business. That regulation section concludes with the following sentence: If a farm is operated for recreation or pleasure and not on a commercial basis, and if the expenses incurred in connection with the farm are in excess of the receipts therefrom, the entire receipts from the sale of farm products may be ignored in rendering a return of income, and the expenses incurred, being regarded as personal expenses, will not constitute allowable deductions. * * * The statutory language and its regulatory explanation do little more than set the stage for a review of the facts in an individual case. The basic question here is one of fact to be decided on the evidence presented. See International Trading Co. v. Commissioner, 275 F. 2d 578 (C.A. 7, 1960), affirming a Memorandum Opinion of this Court. In that case the Court stated that, for a taxpayer's activities to constitute carrying on a trade or business, he must initiate or conduct the enterprise in good faith with an intention of making a profit or of producing income. See also Morton v. Commissioner, 174 F. 2d 302 (C.A. 2, 1949), affirming a Memorandum Opinion of this Court, *159 certiorari denied 338 U.S. 828 (1949); Theodore Sabelis, 37 T.C. 1058 (1962); Dean Babbitt, 23 T.C. 850 (1955). The basic facts in this case are not in dispute. Petitioner operated a farm in Ebensburg, Pennsylvania. The farm had all of the physical characteristics of a real farm. She had farm buildings, machinery and equipment and livestock, all common to farm operations. Petitioner hired farm help, was guided by authorities and engaged in ordinary farming activities. She lived alone in the farmhouse and spent her full time in running the farm. Petitioner tried different activities and different combinations of activities in an attempt to make the farm a success. She improved the soil, drained the swamps, sowed new grasses and followed recommended practices. The farm was not a country estate and was not used to any material extend for entertaining or recreation, nor was it equipped for such purposes. Respondent argues that petitioner had a scientific interest in breeding characteristics and diseases of her animals and this completely dominated and controlled the size and purpose of her expenditures throughout her operation to the complete *160 subservience of any profit motive. Petitioner's training was helpful in her farming activities and, it is true, she was interested in reproduction, diseases and breeding characteristics. This interest on the part of petitioner, however, does not detract from her intention and purpose to operate a farm as a business. We think petitioner, although unsuccessful in her undertaking, entered into the business of farming for profit, and that each time she changed or added an activity, she did so for this reason and with this purpose and intent. We add that our review of the record as a whole satisfies us that the farm was not operated as a hobby, or for pleasure, or to satisfy some paramount interest in the family farm. We have, of course, given careful consideration to the series of substantial losses suffered by petitioner. This is a factor which we must weigh carefully. Nevertheless, we think that on the over-all facts, the losses are not here controlling, and do not of themselves transpose a business into an activity run for personal reasons. Marshall Field, 26 B.T.A. 116 (1932), affd. 67 F. 2d 876 (C.A. 2, 1933); Cecil v. Commissioner, 100 F. 2d 896 *161 (C.A. 4, 1939); Morton v. Commissioner, supra; Dean Babbitt, supra; Norton L. Smith, 9 T.C. 1150 (1947). See also American Properties, Inc.28 T.C. 1100 (1957), affd. 262 F. 2d 150 (C.A. 9, 1958). Under all the circumstances, we conclude that petitioner's activities during the years in question amounted to the operation of a farm on a commercial basis and not a personal one. The losses in question are, therefore, deductible. Decision will be entered under Rule 50. Footnotes
1. Respondent has not contended that the expenses were not paid nor that they were not ordinary and necessary.↩