William L. Brueck, Sr., and Gwen A. Brueck v. Commissioner.
Brueck v. Commissioner
Docket No. 4462-62.
United States Tax Court
T.C. Memo 1964-204; 1964 Tax Ct. Memo LEXIS 133; 23 T.C.M. (CCH) 1228; T.C.M. (RIA) 64204; July 31, 1964
*133 L. J. Benckenstein, Petroleum Bldg., Beaumont, Tex., for the petitioners. Martin J. Nash, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar years 1959 and 1960 in the amount of $365.36 and $366.51, respectively. The issue for decision is whether petitioners are entitled to deductions in each of the years 1959 and 1960 for the losses sustained in their farming operations. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife residing in Groves, Texas, filed joint Federal income tax returns for each of the years 1959 and 1960 with the district director of internal revenue at Austin, Texas. William L. Brueck, Sr. (hereinafter referred to as petitioner) was employed as an hourly worker in the Cracking Department of the oil refinery of the Gulf Oil Corporation at Port Arthur, Texas during the years here in issue. In 1947 petitioners acquired a farm situated near Woodville in Tyler County, Texas. Although the deed to this farm in describing the tract called for 25 1/2 acres more or less, the *134 tract described actually contains approximately 30 acres. In December 1963 petitioner retired from his employment with Gulf Oil Corporation and petitioners moved to the farm at Woodville, Texas. The farm which petitioners acquired in 1947 is between 60 and 65 miles from Groves, Texas, and is located adjacent to the city limits of Woodville about 1 mile south of the courthouse in that city. During his minority petitioner lived on a 120-acre farm operated by his parents in Amite County, Mississippi. The farm on which petitioner lived as a child was a generalized farm. When petitioner was 13 years old his father died and for several years petitioner assisted his mother and sisters in the operation of the farm while his brothers were away in military service during World War I. During the early 1920's petitioner attended Amite County Agriculture High School, a publicly supported school with curriculum requiring not only book study but field experience in agriculture. In his training at this school petitioner actually worked on the farm owned by the school under the supervision of his instructors. Upon graduation from the Amite County Agriculture High School in 1924, petitioner *135 received a scholarship to the State Agriculture College. Intending to work to obtain the money for clothes and other incidentals in order that he might use his scholarship to attend the State Agriculture College, petitioner, shortly after his graduation from high school, went to Port Arthur, Texas and obtained a job as a common laborer in the oil refinery of the Gulf Oil Corporation in that city. Approximately a year after he had started working in the oil refinery petitioner married his present wife. Petitioner continued working at the Gulf Oil Refinery in Port Arthur, Texas until his retirement in 1963. Petitioners have two children. In 1937 petitioners acquired a small tract of land in Groves, Texas and began farming operations thereon with a truck garden, a cow, some pigs and chickens. Subsequent to 1937 petitioners acquired four additional cows and operated a small dairy business on this farm near Groves. In 1940 petitioner bought a larger farm in Tyler County, Texas, near Woodville, about 6 miles west of where the farm he acquired in 1947 is located. Petitioner operated this farm as a truck farm, raising potatoes, beans, peas, tomatoes, watermelons, and cantaloupes, which *136 he hauled to Port Arthur and Beaumont, Texas to sell on the market. He also raised hogs and cattle and bought and sold cows. In early 1947 petitioner had 17 cows and 1 bull on the farm 6 miles west of Woodville. In September 1946 both of petitioner's children entered college, and in February 1947 petitioner sold his farm 6 miles west of Woodville to obtain money to use to pay the college expenses of his children. He used a portion of the money he obtained from the sale of the farm 6 miles west of Woodville as a down payment on the farm adjacent to the Woodville city limits that he acquired in 1947. When petitioner sold the farm 6 miles west of Woodville, he sold the cattle and other stock on the farm along with it. Petitioner had plans to purchase the farm adjacent to the city limits of Woodville when he sold the other farm. Between the time he acquired the farm in 1947 and 1959, petitioner constructed a small personal residence, several small barns approximately 10 by 20 feet and 12 by 12 feet, sheds, feed troughs, and other farm facilities upon the Woodville farm. Most of these improvements were personally constructed by petitioners during their off or spare workdays. During *137 the year 1958 petitioner purchased a cub tractor and chain saw. No new construction was done at the Woodville farm during the years 1959 and 1960, but during these years petitioners did make some improvements and repairs to buildings previously constructed. In addition to constructing the buildings on the Woodville farm acquired in 1947, petitioners cleared the land, fenced it, cross fenced it, and cleaned out the springs and well, planted grass seed and clover to improve the pasture, put out fruit trees, and started caring for the shrubbery that grew on the place looking toward the possibility of being able to sell some. In 1951 petitioner bought his first cow to put on the Woodville farm and began doing some truck farming, hauling the produce back to Port Arthur and Beaumont to sell. During the first few years of operating the farm at Woodville, petitioner made small profits from the operation but starting in 1957 petitioner sustained losses from this operation, having losses in the years 1957 through 1962 as follows: 1957
$1,197.29
1958
1,885.23
1959
2,090.00
1960
2,145.39
1961
1,390.69
1962
966.00
During the years 1959 and 1960, approximately 15 *138 acres of petitioners' farm had been put into improved pasture and petitioner continued to put more of the acreage into improved pasture thereafter. As of January 1, 1959, petitioner had three cows on his farm and during the year 1959 he sold a cow and a calf for $137. In 1958 petitioner made an agreement with another person to get into a business of breeding Shetland ponies with burros and jacks to raise Shetland mules. Petitioner acquired some burros and jacks which he placed on his farm and the person with whom he had the agreement was to furnish the Shetland pony mares. The agreement did not work out satisfactorily and petitioner bought two mares intending to carry on a business of raising horses on his farm. Petitioner was of the opinion that you could carry horses on the farm along with cows since horses would eat the high grass, and cows, the short grass. Petitioner bought a registered mare which was supposed to have been bred to a registered stallion, but she didn't have a foal. When petitioner concluded that the arrangement for raising Shetland mules was not going to be carried through and that the raising of horses would not be successful, he sold the burros, jacks, and *139 horses he had purchased at the best price he could obtain. Petitioner had bought two saddles at the time he had the horses on his place, and he sold one of these in 1960 and the other in 1961. Before the end of 1959 petitioner had sold one of the mares and two of the burros he bought in that year. The stock on his farm at the beginning of 1960 consisted of one mare, one burro, and five cows. The mare was valued at $100 and the burro at $50, and the five cows at $100 each. During 1960 petitioner sold three cows, the one burro, one of his saddles and some timber. Petitioner as of December 31, 1960, had six cows and one mare in inventory. During the years 1947 through 1958 petitioner made the following capital expenditures: Year
Expenditure
Amount
1947
House and barns
$ 700.00
1952
Machinery and tools
392.33
1957
Weed cutter
119.93
1958
Machinery and tools
1,004.00
1958
Chain saw
100.00
1958
Two saddles
75.00
At the time of acquiring the farm in 1947 petitioner planned to go into the commercial cattle business on the farm, raising cattle for slaughter. Petitioner was of the opinion that he could make a profit on the farm by keeping a breeding *140 herd, raising calves, selling all of the male calves and all of the heifers except the ones he decided to keep for replacements in his herd. Calves are generally sold at 5 to 7 months old at a weight of 400 to 500 pounds. During the years here involved petitioner sold his calves as milk-fed calves when they were weaned. It is usual to crib feed calves at times but petitioner decided that it was preferable not to crib feed his calves while he was not living on the place. Petitioner had talked to the county agricultural agent about his project. The county agent had told him that people generally considered that improved pasture would carry one cow for every 2 acres. The agent also told petitioner that he should carry 20 head of cattle on his place to make a profit. The agricultural agent also advised petitioner on the amount of fertilizer to put out and the type of grass to plant. Petitioner did not have any registered cattle and did not intend to raise registered cattle because of the amount of veterinarian's services and other expenses required to raise such cattle. Petitioner at times used his neighbor's bull for breeding but also at times acquired his own breeding bull. It was *141 petitioner's practice to buy a bull in the spring of the year, keep it through the breeding season, and sell it in the fall in order to be relieved of the expense of feeding the bull during the winter. In 1959 and at other times thereafter petitioner owned a purebred bull but never a registered bull. During the years 1957 through 1962 petitioner showed total receipts from his farming operation as follows: 1957
$276.64
1958
615.30
1959
148.00
1960
264.25
1961
307.99
1962
457.00
Petitioner had a small stock pond on the farm which was used as a watering place for cattle. He believed he could make a profit from his cattle operation if he could increase his herd and after his unsuccessful effort with Shetland mule and horse breeding, he began to work towards increasing his herd of cattle. From the time of acquiring the farm in 1947 throughout the years here involved petitioner was operating the farm with an intent to make a profit. Petitioner on his income tax returns for the years 1959 and 1960 deducted the net losses sustained in the operation of his farm. Respondent disallowed the claimed deductions with the following explanation: It is determined *142 that the farm loss * * * was not incurred while in the business of farming, therefore no deduction is allowable. * * * Opinion Petitioner takes the position that since he was operating his farm during the years 1959 and 1960 with an intent and in an effort to make a profit, he was engaged in a trade or business of farming and the losses be sustained in that undertaking are deductible. It is respondent's contention that petitioners purchased the farm to satisfy their personal desires for an outdoor life and also as an investment. It is his position that petitioners were engaged in weekend farming, primarily for recreation and other personal reasons, and that therefore the losses sustained are not deductible since they were not incurred in a trade or business or a transaction entered into for profit. Both parties recognize that the issue here is purely a factual one. Respondent calls attention to the consistent losses over the years 1957 through 1962 and states that this consistent pattern of losses is a factor to be considered as it bears on petitioner's intent, citing Morton v. Commissioner, 174 F. 2d 302 (C.A. 2, 1949), wherein the Court stated: It is true that *143 a record of continual losses over a series of years does not in itself preclude the allowance of such losses as a business expense. [Footnote omitted.] The intent of the taxpayer in making his expenditures is what counts; but the continuing lack of profits is an important factor bearing on the taxpayer's true intention. [Footnote omitted.] * * * Petitioner takes the position that the losses over the 5-year period were occasioned to a large extent by unfortunate circumstances peculiar to those years. Petitioner relies on his direct and positive testimony that from the beginning, his operation of the farm was with an intent to make a profit, the fact that during most of his lifetime he had engaged in farming for a profit usually with success, and the nature of his farm and his operation thereon, to establish that his farming operation was a trade or business. Petitioner relies on a number of cases including Dean Babbitt, 23 T.C. 850, 855, 867, and 868 (1955), and Thomas F. Sheridan, 4 B.T.A. 1299 (1926). Under the facts in the instant case we agree with petitioner. There is no showing whatsoever that petitioners' farm was a hobby or that petitioners *144 used their farm as a place of recreation to overcome petitioner's direct testimony that it was not a hobby and was not used for recreation. Petitioner testified that he sold the farm he had been operating prior to 1947 in order to obtain the money to send his children to college and purchased the farm which he owned in the taxable years here involved intending to pursue farming as a business for profit and did in fact make a profit for several years from this farm. The only scintilla of evidence in the record to the contrary of this positive testimony is whatever inference might be drawn from petitioner's losses during the years 1957 through 1962 and some vague testimony by an internal revenue agent of statements petitioner made to him. Petitioner has explained the efforts he was making to convert his losses into profits. After losses in 1957 and 1958 he attempted to supplement his income by raising Shetland mules and horses. This effort proved unsuccessful and he then began to increase his herd of cattle. These undertakings show that petitioner was in fact attempting to operate his farm at a profit. Petitioner had for approximately 18 years prior to 1957 operated a profitable *145 farm to supplement his hourly wages from his work at the Gulf Oil refinery. His testimony that it was his intention to continue a profitable operation of the farm to supplement his income from wages was straightforward and convincing. In the midfifties he did venture into a concentration on cattle without reliance on the truck farming he had previously carried on. However ill-advised petitioner might have been to drop his truck farming and fruit growing to concentrate his activities on a commercial cattle operation, we are satisfied that he carried on the cattle operation with an intent to make a profit. The evidence also supports petitioner's contention that there did exist a reasonable expectation of his operating the farm at a profit as a cattle farm. Respondent contends that since on the average it takes 2 acres of improved pasture for one cow and since the county agricultural agent told petitioner he should carry 20 cows to make a profit, the evidence does not support petitioner's judgment that he had a reasonable prospect of making a profit from a cattle operation. Petitioner has continued through the years to improve his pasture and increase his cattle. Petitioner could well *146 develop his land to a point where it would support a greater number of cows per acre than the average or could use supplemental feed. Also, petitioner felt he might well show a profit with less than 20 cows, if he got a calf from each cow each year which he generally did. Under the facts here petitioner did have a reasonable prospect of making a profit. See Norton L. Smith, 9 T.C. 1150 (1947). Respondent in his brief states: * * * It is submitted that the petitioner was motivated primarily by his personal desire for the pastoral life rather than by a pecuniary interest. The wooded areas on the farm afforded him an opportunity to hunt, and the pond afforded him an opportunity to fish. The horses on the farm, in addition to being available to herd the three cows, were available for personal riding purposes. Under cross-examination petitioner stated that he had always enjoyed "outdoor life" and thought such a life a healthy way to live. Otherwise, there is no evidence whatsoever in the record to support this argument of respondent's. The only mention of hunting in the record is petitioner's statement, in response to a question on cross-examination of whether he liked *147 hunting, "Well, I never had time to hunt much in my life." The only reference in the record to fishing is petitioner's response of "Very little", to a question on cross-examination of whether he fished a "little bit." Petitioner was emphatic that he bought the farm at Woodville intending to put it in shape to operate as a commercial cattle venture and that during the 2 years here involved in addition to attempting to build up his herd of cattle, he was trying to operate a horse breeding venture unsuccessfully and also unsuccessfully attempting to start a business of raising Shetland mules. The fact that petitioner enjoyed farm work is no basis for inferring that his farm was not a business operation. Thomas F. Sheridan, supra. Respondent further contends that the losses here involved should be disallowed since petitioner had purchased the Woodville farm as an investment planning either to sell it for subdivision at a profit or to build cabins around his "lake" to rent for weekend recreational purposes. Petitioner emphatically denied that he had such intentions. He also denied that he had made any statements to this effect to the revenue agent who investigated his tax *148 returns. The evidence respondent offered to support his contention was the testimony of the revenue agent who investigated petitioner's tax returns for the years here in issue. This witness stated that he had refreshed his recollection by reviewing certain conference notes included in his work papers underlying his agent's report and from these he testified that petitioner had stated to him that he had been improving his property for several years and intended to sell it at a profit and that later petitioner stated to him that "he had a lake, I believe he called it, which was on his property which he was intending to build some cabins on, and this was to be rented out for fishing or weekend recreation, et cetera." The internal revenue agent obviously had no independent recollection of these conversations. He relied entirely on his notes. It may well be that petitioner made some general statements in talking to the agent of things that he might some day do with this farm. We do not doubt that the revenue agent paraphrased the conclusions he drew from petitioner's statements which he had included in his work papers. We do not believe these statements truly represented petitioner's *149 intention in the years 1959 and 1960 as to his use of his farm. Even if petitioner did have some dreams as to what might be done in the future with his farm, certainly for the years here involved and for years prior thereto, he was engaged in a farming operation with an intention to make a profit. Respondent's final contention is that petitioner purchased the farm for a retirement home and not to operate as a business. Although there is no direct evidence in the record to support respondent's statement that petitioner planned to retire on his farm, the record as a whole gives a fair inference that he did plan to become a fulltime farmer when he retired from his work at the Gulf Oil Corporation. This fact, however, does not show that petitioner was not operating the farm as a business during the years here involved, nor that he did not intend to continue his farming business after he retired from his work at the Gulf Oil Corporation. Dean Babbitt, supra. Under the facts of this case, we hold petitioner is entitled to deduct the losses he sustained in 1959 and 1960 in his farming operation. Since certain adjustments made in the notice of deficiency have not been contested by petitioner. *150 Decision will be entered under Rule 50.