Harold I. Snyder and Marilynn M. Snyder v. Commissioner.
Snyder v. Commissioner
Docket No. 1928-64.
United States Tax Court
T.C. Memo 1966-259; 1966 Tax Ct. Memo LEXIS 25; 25 T.C.M. (CCH) 1326; T.C.M. (RIA) 66259; November 29, 1966
*25 1. Payments made by Harold to his former wife, Donna, for the support of their two minor children, pursuant to the terms of a settlement agreement incorporated in the divorce decree, are not deductible by petitioners as periodic payments of alimony. 2. Payments made by Harold on a mortgage on a residence conveyed to Donna, pursuant to the terms of the separation agreement, are not deductible by petitioners as alimony. 3. Insurance premiums paid by Harold on a life insurance policy on his life in which Donna was to be named primary beneficiary until her death or remarriage, pursuant to the terms of the separation agreement, were not deductible by petitioners as alimony. 4. Petitioners were not engaged in the business, during the years 1959-61, of raising horses and/or cattle for sale at a profit, and their losses in the operation of the farm on which they lived were not deductible as farm losses. Richard J. Brentlinger and George D. Masser, 8 E. Long St., Columbus, Ohio, for the petitioners. Richard M. Schwartz, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the taxable *26 years 1958 through 1961 as follows: Year
Deficiency
1958
$ 618.83
1959
965.19
1960
1,824.63
1961
2,971.91
Some of the adjustments made in the notice of deficiency, including all the adjustments for the year 1958, have been settled between the parties, and these adjustments will be reflected in the Rule 50 computations. The issues remaining for decision are as follows: 1. Whether payments made pursuant to a divorce decree by Harold I. Snyder (hereinafter referred to as Harold) to his former wife, Donna Mae Snyder (hereinafter referred to as Donna), for the support of two minor children born of the marriage in the amount of $2,400 for each of the taxable years 1959 through 1961, constitute alimony under section 71(a)(1), I.R.C. 1954, [1] so that such payments may be deducted by Harold under section 215. 2. Whether payments made by Harold, pursuant to a divorce decree, on a mortgage on a residence conveyed to Donna in the amounts of $1,690, $1,040, and $1,300 for the taxable years 1959, 1960, and 1961, respectively, constitute periodic payments of alimony under section 71(a)(1), so that such payments may be *27 deducted by Harold under section 215. 3. Whether premium payments made by Harold on his National Service Life Insurance Policy, pursuant to the divorce decree, in the amounts of $17.40 and $104.70 for the taxable years 1960 and 1961, respectively, constitute periodic payments of alimony under section 71(a)(1) so that such payments may be deducted by Harold under section 215. 4. Whether losses sustained by petitioners for the taxable years 1959 through 1961 in the operation of a farm are deductible under section 165(c)(1) as losses incurred in a trade or business. General Findings of Fact The stipulated facts are incorporated herein by this reference. Petitioners were husband and wife during the taxable years in question, living near New Philadelphia, Ohio, and filed their joint income tax returns with the district director of internal revenue, Cleveland, Ohio. Issue 1 Deductibility of Child Support Payment Findings of Fact Harold and Donna were divorced on May 22, 1958. Paragraph 14 of Harold's obligations under a separation agreement, which was subsequently incorporated in the divorce decree, provided as follows: That HAROLD I. SNYDER shall pay to DONNA SNYDER, for care, support, *28 maintenance, and education of the said minor children of the parties hereto, the sum of ONE HUNDRED DOLLARS ($100.00) per month per child, said payments to be made in semi-monthly installments on the first and fifteenth days of each and every calendar month, commencing the first day of June, 1958, and continuing thereafter until each of said children dies, becomes self-supporting, marries, or completes up to a standard four-year college course, whichever event shall occur sooner; provided, however, that during the periods of visitation of up to two (2) months' duration during the summer of each calendar year, that said HAROLD I. SNYDER shall not be obligated to pay the aforementioned sum of ONE HUNDRED DOLLARS ($100.00) per month per child during such visitation periods. Paragraph 18 of the separation agreement provided as follows: HAROLD I. SNYDER shall pay to DONNA SNYDER, as and for alimony, the sum of ONE HUNDRED DOLLARS ($100.00) per month, in semi-monthly installments of FIFTY DOLLARS ($50.00) each, commencing on the first day of June, 1958, and continuing for a period of Five (5) years, or if said DONNA SNYDER should die or remarry within said five-year period, then such payments *29 shall cease and terminate immediately. Pursuant to the above provisions of the separation agreement, Harold paid to Donna $300 per month or $3,600 per year in each of the years 1959, 1960, and 1961. The total monthly payment of $300 was made in two payments of $150 each on the 1st and 15th day of each month. Paragraph 1 of Donna's obligations under the separation agreement provided in part: That so long as the said HAROLD I. SNYDER makes the payments and performs his agreements herein contained, * * * she will support and maintain their said children, except as the said HAROLD I. SNYDER has hereinbefore obligated himself to do so, * * *. On their tax returns for each of the years 1959, 1960, and 1961, petitioners deducted the entire $3,600 paid by Harold to Donna as alimony. In the notice of deficiency issued to petitioners respondent determined that $2,400 of the $3,600 payments made in each of the years 1959, 1960, and 1961 was "not an allowable deduction since it does not constitute alimony under the provisions of section 215, of the Internal Revenue Code of 1954." Opinion The first question for decision is whether $200 per month or $2,400 per year of the payments made by Harold *30 to Donna in each of the years in question constitutes alimony under section 71(a)(1) so that such payments may be deducted under section 215. Petitioners contend that the payments in question were made directly to Donna without any reservations or restrictions relative to the use of the amounts paid; that the obligation to support the children was placed on Donna; and that the amount to be used for the support of the children is not "fixed" either by the separation agreement or otherwise. Respondent urges that the terms of the separation agreement specified or fixed a definite sum of money payable for the support of the minor children and therefore such payments would not be includable in Donna's gross income and accordingly are not deductible by Harold as alimony payments. Alimony payments are deductible by the former husband under section 215[2] *31 if they are taxable to the former wife under the provisions of section 71(a). [3] When payments are fixed by the terms of the decree, instrument, or agreement as a sum payable for the support of minor children, they are neither deductible by the husband nor taxable to the wife. Sec. 71(b). [4] *32 Harold was divorced from Donna on May 22, 1958. Of the $3,600 paid by Harold to Donna for each of the years 1959 through 1961, a specific portion, in the amount of $2,400 each year, represented a fixed payment for the support of the two children. There is no question but that this portion of the payments was specifically designated by the terms of the separation agreement as a sum payable for the support of the minor children. The agreement is unambiguous and clear, and neither petitioners nor respondent argues that the language does not reflect the actual agreement of the parties. Petitioners argue, however, that actual payment of the money to Donna is the critical factor. Apparently it is petitioners' view that the terms of the separation agreement are not binding *33 on Donna; or stated another way, that the language in the separation agreement is precatory only. Certainly the separation agreement could not provide that payments were to be made directly from Harold to the minor children; and it is difficult to imagine a more expedient and appropriate manner in which the separation agreement could "fix, in terms of an amount of money," a sum payable for the support for the minor children. The mere fact that payment was to be made to Donna and that Donna may not have been required to account to Harold for her use of the money is not controlling. The significant factor is that the decree, instrument, or agreement specifically designates the amount of money or the portion of each payment that is for the support of the minor children. As said in Commissioner v. Lester, 366 U.S. 299 (1961): As we read § 22(k), [predecessor of sec. 71, I.R.C. 1954] the Congress was in effect giving the husband and wife the power to shift a portion of the tax burden from the wife to the husband by the use of a simple provision in the settlement agreement which fixed the specific portion of the periodic payment made to the wife as payable for the support of the children. *34 * * * The separation agreement must expressly specify or "fix" a sum certain for child support before any of the payment is excluded from the wife's income. Commissioner v. Lester, supra. The separation agreement in question clearly specifies the amount to be paid for child support. That amount is not includable in the wife's income and is not deductible by the husband. We sustain respondent as to this issue. Issue 2 Deductibility of Mortgage Payments as Alimony Findings of Fact Paragraphs 2 and 3 of the separation agreement provided as follows: 2. That HAROLD I. SNYDER will convey to DONNA SNYDER by good and sufficient warranty deed, all of his right, title and interest in and to the residence real estate presently in his name and located at 444 North Broadway, New Philadelphia, Ohio; such conveyance to be subject to the mortgage lien upon said premises of the Tuscarawas Savings & Loan Company of New Philadelphia, Ohio, in the approximate amount of ELEVEN THOUSAND FIVE HUNDRED DOLLARS ($11,500.00). 3. That HAROLD I. SNYDER hereby agrees that he will pay the mortgage obligation to the Tuscarawas Savings & Loan Company according to the terms of said note and mortgage, and further, *35 to indemnify and save harmless the said DONNA SNYDER from any claim or demand of said Tuscarawas Savings & Loan Company under the said mortgage obligation. Provided, however, that it is further agreed by and between the parties hereto that in the event that DONNA SNYDER sells the said real estate prior to the complete satisfaction of the said mortgage obligation, then the said HAROLD I. SNYDER shall pay to DONNA SNYDER, in monthly installments of ONE HUNDRED THIRTY DOLLARS ($130.00) each, the amount of the said unpaid balance of said mortgage obligation. It being understood and agreed that the actual mortgage obligation shall be satisfied from the proceeds of the sale of said real estate at the time of sale. It is further agreed that the said HAROLD I. SNYDER may pay to DONNA SNYDER, in the event of sale of the real estate, the entire unpaid balance of said mortgage at any time. On May 22, 1958, the date of petitioners' divorce, the balance due on the mortgage was $11,346.95 and the mortgage payments were $130 per month. Both Harold and Donna were jointly liable on the mortgage. The checks made to the Tuscarawas Savings & Loan Co. in payment of the mortgage were in the following amounts: *36 Year
Amount
1959
$1,690
1960
1,040
1961
1,300
Petitioners did not claim these payments as deductions for alimony paid on their returns; they did claim that portion thereof that was applicable to interest on the principal sum secured by the mortgage as deductible interest. Petitioners raised this issue and issue 3 by amended petition. Opinion The question presented is whether the payments made in partial satisfaction of the mortgage debt constitute periodic payments of alimony under section 71(a)(1), so that such payments may be deducted by Harold under section 215. Petitioners argue that because the payments were made to reduce an obligation outstanding against the residential real estate owned by Donna and were to be paid irrespective of whether the property was sold or retained by her, they were a part of the total alimony payments to be made to Donna. Respondent argues that the monthly mortgage payments made in partial satisfaction of the mortgage debt constitute "installment payments" made in discharge of a principal sum which was to be paid within 10 years from the date of the decree of divorce. In general, section 71(c)(1)[5] provides that installment payments discharging a part of an *37 obligation the principal sum of which is specified in the agreement shall not be treated as periodic payments. Respondent contends that the payments in question should not be considered periodic payments, Donna would not be required to include the payments in income under section 71(a)(1), and correspondingly Harold is not entitled to an alimony deduction under section 215. In addition, respondent maintains that, assuming regular payments, it would take 9 years and 9 months from the date of the divorce decree to amortize the mortgage balance, and therefore the exception provided in section 71(c)(2)[6] *38 concerning installment payments made over a period of 10 years or more is not applicable. We agree with respondent. The applicable provisions of the separation agreement in question indicate that Harold was to pay the mortgage obligation outstanding against the residence, and that the mortgage lien was in the approximate amount of $11,500. If the house was sold, the mortgage was to be paid off from the proceeds received at sale, and Harold was to pay Donna $130 per month until any unpaid balance of the mortgage obligation was satisfied. By its terms the separation agreement provides for a principal sum to be discharged by installment payments. As a general rule, whenever the agreement incident to a divorce decree provides *39 for payment of a principal sum in installments, the installment payments will not qualify as periodic payments unless they may be or will be made over a period ending more than 10 years after the date of the decree. Sec. 71(c)(2). Respondent introduced testimony that the principal sum would be discharged within a period not exceeding 9 years and 9 months. This period was apparently based upon information obtained from the savings and loan company, and it was not contradicted by petitioners' witnesses or evidence. Petitioners challenge the period arrived at by respondent on the grounds that the evidence does not disclose whether the 9-year-and-9-month period begins at the time of the agreement, the date the divorce decree was entered, or at the time of trial. The burden is on petitioners, however, to establish that "by the terms of the decree, instrument, or agreement, the principal sum * * * is to be paid or may be paid over a period ending more than 10 years from the date of such decree, instrument, or agreement." This they have failed to do, and therefore we hold for respondent as to this issue. Robert D. Stecker, 31 T.C. 749 (1959). [7] *40 Issue 3 Deductibility of Insurance Policy Premiums Findings of Fact The separation agreement contained the following provision: 9. That HAROLD I. SNYDER will continue, in full force and effect, his National Service Life Insurance and shall pay all premiums due thereon, such policy being in the principal amount of TEN THOUSAND DOLLARS ($10,000.00) until death or remarriage of DONNA SNYDER, and during said time, DONNA SNYDER shall be the named sole primary beneficiary, and that the children of the parties hereto shall be the contingent beneficiaries of said policy, and that the said HAROLD I. SNYDER will do all things necessary to maintain said policy in effect until death or remarriage of DONNA SNYDER. Harold retained physical possession of the insurance policy in question. In the amended petition filed by petitioners *41 it is alleged in part that Harold "paid to his former wife as and for alimony during the years 1960 and 1961 the amounts of $17.40 and $104.70" as premiums on the National Service Life Insurance Policy referred to in paragraph 9 of the separation agreement. Opinion The question presented is whether Harold may deduct as alimony the premium payments on a life insurance policy on his life in which Donna was to be named the sole primary beneficiary, until her death or remarriage, and the children were the contingent beneficiaries. Although petitioners raised this issue in their amended petition they have not argued it on brief. The only evidence presented on the issue were checks drawn on petitioners' account payable to the Veterans' Administration totaling $17.40 in 1960 and $96 in 1961, which Harold testified had been used to pay the premiums on his National Service Life Insurance Policy assigned to Donna. Neither the policy nor any assignment thereof was offered in evidence. The separation agreement did not require an assignment of the policy to Donna. Harold apparently retained possession of the policy. We believe petitioners have abandoned this issue. If not, they have failed to present *42 sufficient evidence to carry their burden of proof with respect thereto. And finally, absent some showing that Donna's interest in the policy was more than that of a contingent beneficiary - "that is, where the policies have not been assigned to her in such a way that she becomes the actual owner and where the proceeds of the policies become hers only if she outlives her husband - the premiums paid by the husband are not deductible by him." James Parks Bradley, 30 T.C. 701. See also, Florence H. Griffith, 35 T.C. 882. Compare Katherine T. Hyde, 36 T.C. 507. Issue 4 Deductions for Farm Losses Findings of Fact In 1957, prior to her marriage to Harold, Marilynn M. Snyder (hereinafter referred to as Marilynn) purchased a farm for approximately $5,500 at public auction. This acquisition was intended to be a real estate investment and at the time of purchase the farm was in very poor condition. It consisted of 108 acres and was located in a very hilly area of Guernsey County, Ohio, which had once been striped mined. It had been occupied by an elderly woman who had become too old to keep it up. The frame farmhouse had no utilities and it and the barn and tool shed were in a bad state of *43 repair. In October 1958 after Harold and Marilynn were married, they moved to the farm in Guernsey County and began improving the general appearance of the property by remodeling the farmhouse, draining ditches, and building fences. At this time Harold planted evergreen trees on the farm as a future investment for the purpose of providing funds for his children's education expenses when they reached college age. Of the total 108 acres, 43 acres were planted with evergreens, 40 acres were pastureland, 15 acres were tillable, and the remainder consisted of woodlands. At the time of their marriage neither Harold nor Marilynn was living in a permanent home. Harold was living in an apartment in New Philadelphia and Marilynn was living in a small college town where she worked. Neither of them had had any experience operating a farm. Marilynn owned one mare and Harold owned a mare and a stallion which they used for riding. These animals were moved to the farm when petitioners moved there. In 1959 petitioners began buying and selling some livestock and during the taxable years 1959 through 1961 their stock of cattle and horses increased and decreased in size. In the year 1959 petitioners acquired *44 three quarter horses and two colts; no horses were sold in that year. In 1960 petitioners acquired an Arabian stallion and an Arabian mare; and three horses (one quarter horse and two colts) were sold in that year. In 1961 no additional horses were purchased, nor were any horses sold by petitioners. In the year 1959 petitioners purchased four cattle (three registered, one grade); no cattle were sold in that year. In the year 1960 no cattle were purchased, nor were any cattle sold by petitioners. In the year 1961 petitioners acquired nine cattle (all of which were grade), and no cattle were sold in that year, although one of their animals died. The two colts purchased by petitioners in 1959, one for $200 and the other for $135, were used primarily for Harold's children to ride when they visited him in the summertime. These colts were sold in October 1960 for $250 each. Petitioners also sold for $250, in October 1960, one of the quarter horse mares they had purchased in 1959 for $150. Neither the two colts nor the mare had been bred. By the middle of 1960 petitioners had decided that quarter horses did not sell for enough on the market to justify feeding and raising them. They made *45 inquiries about Arabian horses and found that Arabians were a more popular breed of animal and sold for considerably more. In September 1960 they acquired an Arabian stallion and an Arabian mare, for which they paid $3,500 and $3,000, respectively. These horses were yearlings when petitioners acquired them. The mare could not be bred until she was 3 to 4 years old and the period of gestation is 11 months; hence petitioners did not expect to get a foal from breeding their Arabians for about 4 years, and then only one per year. Petitioners did hope to breed the Arabian stallion with the quarter horse mare. However, petitioners' horses did not produce any foals during the years here involved. Petitioners sold the quarter horse stallion in 1962. With respect to the four head of cattle purchased by petitioners in 1959, all were heifers but petitioners' records do not indicate that any of them had been bred up to June 1960, except that two unsuccessful attempts had been made to breed them by artificial insemination. Petitioners did not purchase a bull until 1962. The nine heifers purchased by petitioners in 1961 appear to have produced calves in 1962, most of which were apparently sold in *46 1962 for a total sales price of about $620. In 1962 petitioners also sold two of the cows purchased in 1961 for less than had been paid for them. Harold is president of and employed full time by the Snyder Manufacturing Co., Inc., which he founded in 1951 and of which he has been president and controlling stockholder since its inception. The company, whose offices and plant are in New Philadelphia, Ohio, is a fabricator of plastic products and a designer of sophisticated panels for missiles and for the Atomic Energy Commission. Harold does an extensive amount of traveling for his corporation and spends a considerable amount of time away from home. During the years 1959-61 Harold's records indicate that he was away from home overnight between 90 and 120 days a year. His wife was with him some of the time. Due to the amount of time Harold was required to spend on his company business he did not have much time left to operate the farm. Marilynn worked around the farm when she had time to do so but she had a child in 1960 which curtailed her activities to some extent. Petitioners hired nearby farmers to help them on the farm when needed. During the years here involved petitioners did not *47 advertise that they were in the business of raising and selling horses or cattle. They were not active in any breeders' associations and apparently did not exhibit or show their horses or cattle at shows or fairs during this period; at least they did not win any prize money during these years. The only breeding expenses incurred by petitioners were $41 in 1961. Petitioners had no experience prior to 1959 in breeding and raising livestock and they did not spend much time during the years here involved in studying bloodlines or finding other ways to improve the quality of their animals, although Harold did make some inquiries about Arabian horses before he purchased the two Arabian horses in 1960. Petitioners did not employ any professionals to advise them with respect to breeding and raising higher grade livestock and they did not equip their farm during the years involved with much equipment or facilities for use in such an endeavor. The following schedule reflects Harold's salary, dividends, and other income for the years 1959 through 1961 as shown on petitioners' tax returns for those years: Director's
Trust
Year
Salaries
Dividends
fees
income
Bonus
Total
1959
[1] *48 $14,218.00 $ 852
0
0
0
$15,070.00
1960
24,179.40
912
0
0
0
25,071.40
1961
16,946.50
1,207 $50
$6,295.65
$8,800
33,299.15
The following is a summary schedule of petitioners' farm income, farm expenses, and net losses from their farming activities, as reflected on their income tax returns for the years here involved: Farm
Farm
Net
Year
income
expenses
losses
1959
0
$2,143.60
$2,143.60
1960
$889.85
4,891.91
4,002.06
1961
376.03
6,537.09
6,161.06
The farm income reported for 1960 consisted entirely of agricultural program payments and $180 of the farm income reported for 1961 was from the same source. The balance of the farm income reported for 1961 was $196.03 from the sale of swine. Petitioners also reported a long-term capital gain totaling $346.87 from the sale of the mare and two colts on their return for 1960. Petitioners claimed the net farm losses indicated in the schedule above as deductions on their returns for those years. In his notice of deficiency issued to petitioners for the taxable years 1958 through 1961, respondent determined that the farm losses claimed for the years 1959 through 1961 (no schedule of farm income or expenses was filed with the 1958 return) were not allowable because it was "not shown that the farm is operated *49 for profit." Opinion The question presented is whether the losses sustained by petitioners for the taxable years 1959 through 1961 in the operation of their farm are deductible as losses incurred in a trade or business. Petitioners contend that the farm operations constituted a trade or business carried on with an expectation of profit and with a reasonable plan therefor, the business being that of breeding and raising horses and cattle for sale. Petitioners do not argue that their general farming activity constituted a trade or business; and there is no evidence to support such a contention. Respondent's position is that petitioners' losses in the operation of their farm were not incurred in a trade or business for the reason that petitioners did not operate the farm on a commercial basis for profit during the years involved and did not have as their dominant motive in operating the farm the expectations of making a profit. We agree with respondent. As a general rule individuals may deduct losses incurred in a trade or business where the individual sustains the loss in the taxable year and is not compensated by insurance or otherwise. Sec. 165. [8] In the instant case, the expenses *50 incurred by petitioners in the operation of the farm are not questioned; the only dispute between the parties centers around the issue of whether the expenses were incurred in a business venture with the dominant hope and intent of realizing a profit. The fact that a profit was not realized in the years in question, though a material factor to be taken into consideration, is not, standing alone, fatal to petitioners' case. Marshall Field, 26 B.T.A. 116, affd. 67 F. 2d 876. The issue is one of fact which must be determined from all the facts and circumstances in each case. The taxpayer's intent to operate the farm as a business venture with the hope and expectation of making a profit is of prime importance. However, the taxpayer's activities during the years under consideration must be directed toward the accomplishment of that purpose *51 in the reasonably near future before they will constitute a trade or business. While we recognize that the business of breeding and raising horses and cattle for sale cannot be expected to show a profit overnight, nevertheless to qualify as a trade or business entered into for a profit we think there must be some expectation at the time the operation is commenced that the business will produce a profit in the not too remote future. See American Properties, Inc., 28 T.C. 1100, affd. 262 F. 2d 150. A taxpayer's subjective intent to make a profit is not readily ascertainable. His own testimony is entitled to serious consideration, although the weight to be accorded it must necessarily be viewed in the light of the fact that it is usually self-serving. His intent is best illustrated by the taxpayer's overt efforts to accomplish that result; and to a lesser extent the results actually attained. [9] While we do not doubt the sincerity of petitioners' testimony, given in retrospect, we are not convinced from the evidence as a whole that petitioners' primary reason for operating this farm in the years 1959, 1960, and 1961 was for the purpose of breeding and raising livestock for sale at a *52 profit. As pointed out by Judge Learned Hand in Thacher v. Lowe, 288 F. 994, in ascertaining the taxpayer's intent, the court must consider whether it can honestly be said that taxpayer's activities were carried on for profit. In our opinion petitioners' efforts and activities with respect to the horses and cattle during the years here involved do not support the claim that their dominant motive was to make a profit on the venture or that the venture was being conducted as a business in those years. Marilynn *53 bought this farm as an investment before she and Harold were married. The farm was in poor condition at that time and it would probably require some fixing up to make a profit on the investment. Both of them were working, at the time, but in different places. It is not clear how long Marilynn continued to work at Muskingum College after petitioners were married, but she apparently continued for some time. The farm was about equidistant from where both petitioners were living and working. Harold had always wanted to live on a farm, so they moved onto the farm and began repairing it and making it a suitable place to live. They owned three horses between them and it was necessary to repair the fences, etc., to keep these horses at the farm. A year later they bought some more horses and some cattle. However, they apparently did not breed these animals, at least not successfully, and sold some of them in the following year. In September of the following year, 1960, Harold decided to buy two Arabian horses and sell his quarter horse stallion. He knew at the time that he could not expect any foals from these Arabians for about 4 years at the earliest, but he did not acquire any additional *54 horses during the years here involved. There is some evidence that petitioners broke and rode these Arabian horses but we attach little weight to such evidence. Petitioners bought nine additional head of cattle in 1961 but none of these were registered cattle, and petitioners did not successfully breed the few registered cattle they had. In summary, there is very little convincing evidence that petitioners were seriously trying to breed, improve, and increase a herd of either horses or cattle during these years. Nor is there any convincing evidence that petitioners were making a serious effort to establish a reputation for themselves as livestock breeders. They did not advertise that they were in the business nor did they show their animals. They did not acquire equipment and facilities for training the animals. Most of Harold's time was devoted to his own principal business, which by this time had become quite lucrative, and he had little spare time to devote to the farm. Marilynn apparently devoted what time she could to looking after the farm and the animals, and to keeping records, but she also had to take care of her home and her child. Petitioners did not employ any people experienced *55 in breeding and raising high-grade horses or cattle that could help them realize a profit on this operation. In short, petitioners do not appear to have operated the farm as though it was a business venture. In addition to the requirement that to constitute a trade or business within the contemplation of section 162 a taxpayer's activities must be initiated and carried on with the good faith intention of making a profit, it also involves holding one's self out to others as engaged in the selling of goods and services. Deputy v. du Pont, 308 U.S. 488, 499; McDowell v. Ribicoff, 292 F. 2d 174. It is true that petitioners did not use this farm as a showplace; nevertheless they did occupy it as their personal residence. It is not necessary that a farming operation be a hobby to have the losses disallowed. It is necessary that it be shown to be a business entered into for profit to have such losses allowed. The fact that petitioners experienced increasingly heavier losses in each of the years involved - with little evidence that there was any expectation of increasing income in the near future - cannot be ignored. We think the expenses which produced these losses must have improved the *56 farm as a place for petitioners to live, and also as an investment. It would be normal for petitioners to have animals on this farm whether it was maintained as a home or as a business. We recognize that petitioners might have had hopes of developing the farm into a business venture of breeding and raising horses and cattle for sale at a profit in the future, but we cannot find that they had any well-defined plans with regard thereto during the years here involved. During these years petitioners' farming operations were, at best, more in the nature of preparing to enter a business rather than the conduct of a business, coupled with providing themselves with a more comfortable place to live the type of life they enjoyed. On brief petitioners attack the testimony of respondent's examining agent as being indecisive, irresponsible, and not based on fact. We need not pass judgment on these charges because petitioners have made no claim that respondent's determinations were arbitrary or unreasonable, and petitioners' own evidence has failed to carry their burden of proof that the farm losses claimed in the years 1959, 1960, and 1961 were incurred in a trade or business. We hold for respondent *57 on this issue. Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
2. SEC. 215. ALIMONY, ETC., PAYMENTS. (a) General Rule - In the case of a husband described in section 71, there shall be allowed as a deduction amounts includible under section 71 in the gross income of his wife, payment of which is made within the husband's taxable year. No deduction shall be allowed under the preceding sentence with respect to any payment if, by reason of section 71(d) or 682↩, the amount thereof is not includible in the husband's gross income. 3. SEC. 71. ALIMONY AND SEPARATE MAINTENANCE PAYMENTS. (a) General Rule. - (1) Decree of divorce or separate maintenance. - If a wife is divorced or legally separated from her husband under a decree of divorce or of separate maintenance, the wife's gross income includes periodic payments (whether or not made at regular intervals) received after such decree in discharge of (or attributable to property transferred, in trust or otherwise, in discharge of) a legal obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under the decree or under a written instrument incident to such divorce or separation. ↩
4. SEC. 71(b). Payments To Support Minor Children. - Subsection (a) shall not apply to that part of any payment which the terms of the decree, instrument, or agreement fix, in terms of an amount of money or a part of the payment, as a sum which is payable for the support of minor children of the husband. For purposes of the preceding sentence, if any payment is less than the amount specified in the decree, instrument, or agreement, then so much of such payment as does not exceed the sum payable for support shall be considered a payment for such support.
5. SEC. 71(c)(1)↩. - General rule. - For purposes of subsection (a), installment payments discharging a part of an obligation the principal sum of which is, either in terms of money or property, specified in the decree, instrument, or agreement shall not be treated as periodic payments. 6. SEC. 71(c)(2). Where period for payment is more than 10 years. - If, by the terms of the decree, instrument, or agreement, the principal sum referred to in paragraph (1) is to be paid or may be paid over a period ending more than 10 years from the date of such decree, instrument, or agreement, then (notwithstanding paragraph (1)) the installment payments shall be treated as periodic payments for purposes of subsection (a), but (in the case of any one taxable year of the wife) only to the extent of 10 percent of the principal sum. For purposes of the preceding sentence, the part of any principal sum which is allocable to a period after the taxable year of the wife in which it is received shall be treated as an installment payment for the taxable year in which it is received.
7. These payments might be considered a part of a property settlement in which Harold agreed to transfer the residence property to Donna free of encumbrances. In such event Harold would not be entitled to deduct the payments as alimony. In addition the evidence indicates that Harold did deduct as interest that portion of these monthly payments that were allocable to interest on the principal sum secured by the mortgage.
1. A salary of $167.90 from Muskingum College was also reported on the return for 1959.
8. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business;↩
9. At the trial petitioners repeatedly objected to evidence offered concerning their farming operations and activities in years after 1961 on the grounds that such evidence was irrelevant. We think such evidence would usually be quite helpful to a court in determining this issue, particularly where the farming operation has just started. However, we have made no findings of fact with respect to the subsequent years and have not relied on the evidence received with respect to those years in reaching our conclusion here. However, as might be expected, such evidence that was offered with respect to the years subsequent to 1961, if taken into consideration, would not change our conclusion.↩