Jefferson **PATTERSON** and Marvin
B. **Patterson**

v.

The **UNITED STATES.**

No. 155–68.

United States Court of Claims.
May 12, 1972.

488

Clarence T. Kipps, Jr., Washington, D. C., for plaintiffs. Charles T. Akre, Washington, D. C., attorney of record. Robert D. Heyde and Miller & Chevalier, Washington, D. C., of counsel.

Robert N. Dorosin and Joseph Kovner, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant. Phillip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Roald A. Hogenson with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on August 20, 1971. Defendant filed exceptions to the commissioner's opinion, findings and recommended conclusion of law, plaintiffs urged the court to adopt them and the case has been submitted to the court on oral argument of counsel and the briefs of the parties.

Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, it is concluded that plaintiffs are entitled to recover and judgment is entered for the taxable year 1962 in the sum of $18,745.46, together with interest thereon from February 28, 1967, as provided by law, and for the taxable year 1964 in the sum of $14,962.99, together with interest thereon from April 21, 1967, as provided by law.

## OPINION OF COMMISSIONER

HOGENSON, Commissioner: This is an action to recover alleged overpayments of federal income tax for the taxable years 1962 and 1964 in the amounts of $15,236.14 and $13,415.77, respectively, plus assessed interest paid in the re-

spective amounts of $3,509.32 and $1,-547.22, all in the sum of $33,708.45, plus statutory interest. The suit arises as a result of defendant's disallowance of certain farm losses for those years under section 165 of the Internal Revenue Code of 1954.[1] For reasons appearing below, defendant's disallowance was improper, and plaintiffs are entitled to recover.

Plaintiffs, Jefferson Patterson and Marvin B. Patterson, are husband and wife whose legal residence is Point Farm, St. Leonard, Maryland. They have a substantial annual income from extensive and varied investments in real estate, stocks and bonds. Plaintiffs filed joint income tax returns for the taxable years 1962 and 1964.

Thereafter, the Internal Revenue Service assessed deficiencies of tax against plaintiffs for 1962 and 1964, on the ground that losses which were reported from the operation of Point Farm were not allowable under section 165. Plaintiffs paid the deficiencies, together with assessed interest, as follows:

| Year | Tax | Interest | Total | Date paid |
|------|-----|----------|-------|-----------|
| 1962 | $15,236.14 | $3,509.32 | $18,745.46 | February 28, 1967. |
| 1964 | 13,415.77 | 1,547.22 | 14,962.99 | April 21, 1967. |
| Total | 28,651.91 | 5,056.54 | 33,708.45 | |

On June 23, 1967, plaintiffs filed claims for refund of the deficiencies and interest paid for 1962 and 1964, respectively, on the ground that the losses incurred in the operation of Point Farm in those years were losses incurred in a trade or business within the meaning of sections 162 and 165.

The Internal Revenue Service disallowed plaintiffs' claim for refund for 1964 by statutory notice dated January 16, 1968; and with respect to the claim for refund for 1962, took no action thereon within 6 months after the date of its filing. Plaintiffs' petition herein was filed on May 16, 1968.

Jefferson Patterson, hereinafter referred to individually as plaintiff, is a 1913 graduate of Yale University and a 1916 graduate of the Harvard Law School. He entered the Foreign Service in 1921, retiring therefrom in 1958 after having served the United States in many foreign countries over a long period of years. His service was climaxed by holding the office of United States Ambassador to Uruguay from 1956 to 1958.

Plaintiff first became interested in farming through his sister and brother-in-law, who had a farm on the Patuxent River in southern Maryland, and who were successful Angus cattle breeders. Following that interest, plaintiff searched for a farm in the same southern Maryland area suitable for cattle raising. In 1931, he acquired Peterson Point Farm, consisting of 311 acres and located on the Patuxent River and St. Leonard Creek in St. Leonard, Maryland. Thinking that increasing the acreage would make the operation more successful, plaintiff added to the farm with the purchase in 1942 of the adjacent King's Reach Farm (55 acres) and, in 1950, of the adjacent Asbury Farm (110 acres). Plaintiff's Point Farm was composed of the above-mentioned parcels of land, totaling 476 acres, during 1962 and 1964.

Point Farm first became operational in 1932. At about that time, plaintiff engaged the services of John L. King, who was a member of a New York farm management and consulting firm by the name of Burlingame, Barron, Rice and King. Subsequently, in 1937, Mr. King established his own farm management firm with offices in Washington, D. C. Mr. King's reputation in Maryland as a

---

1. All section references hereinafter are to the Internal Revenue Code of 1954 and the regulations thereunder.

farm consultant was good. Since January 1969, because of the illness of John L. King, plaintiff has employed J. Mayo Brown, who was a member of the John L. King organization for a long time, as a nonresident consultant and advisor in farm management. Mr. Brown grew up on a farm. He has personally farmed, and has been engaged in professional farm management since 1958.

In addition to the services of John L. King, plaintiff in 1938 hired a resident farm manager, Stanley Houghton. Houghton remained manager under the direction and supervision of plaintiff until the former's death in a tractor accident on the farm in 1955. After Houghton's death, Leroy Beverly became the resident farm manager. Leroy Beverly started working for plaintiff as a farmer under Houghton in 1942. He has worked there continually except for the period 1944 to 1946, when he was in military service. Leroy Beverly was raised on a farm, and had extensive farm experience.

Plaintiff relied on his farm consultants and also on his resident farm managers in acquiring farm machinery or equipment. Plaintiff hesitated about purchasing some of the equipment, but concluded that it was necessary because of the lack of availability of farm labor. The farm held the equipment as long as possible.

With Stanley Houghton in charge, plaintiff began the acquisition of a registered Angus breeding herd. While plaintiff's cattle won a number of local and area prizes over the years, the breeding herd did not prove to be a moneymaker. In 1955, plaintiff became discouraged and decided to end his breeding operation. In addition to the herd's unprofitability, a factor in this decision was the discovery in 1955 that a prize young bull purchased for $15,000 was virtually sterile. Another factor leading to plaintiff's discouragement was the death in 1955 of the man in charge of the breeding operation, Stanley Houghton. The herd was sold in 1955 at a loss at auction at the Frederick County Fairgrounds.

During the period 1938 through 1955, when plaintiff was attempting to develop the Angus breeding herd, Point Farm operated at an annual net loss in every year [2] except 1943, as follows:

| Year | Net farm profit (loss) per return |
|---|---|
| 1939 | $(7,412.42) |
| 1940 | (4,869.45) |
| 1942 | (3,353.75) |
| 1943 | 2,305.47 |
| 1944 | (6,729.93) |
| 1945 | (840.08) |
| 1946 | (7,366.78) |
| 1947 | (6,848.46) |
| 1948 | (7,913.72) |
| 1949 | (16,480.21) |
| 1950 | (8,621.63) |
| 1951 | (6,234.06) |
| 1952 | (24,281.89) |
| 1953 | (26,453.11) |
| 1954 | (24,761.43) |
| 1955 | (78,546.28) |

From 1956 to 1968, the emphasis in operating Point Farm was placed on the growing of tobacco. During part of that period, there were acreage restrictions on Maryland tobacco. The United States Department of Agriculture set 12.73 acres as the tobacco allotment for Point Farm for the years 1958 to 1964. For 1965, that allotment was 10.82 acres. After 1965, Maryland tobacco farmers voted out acreage allotments and marketing quotas for Maryland tobacco. Point Farm was generally operated in the following manner for the years 1956 to 1968, subject to the acreage restrictions just described.

| Crop | Acres |
|---|---|
| Tobacco | 15 |
| Soybeans | 47 |
| Corn | 37 |
| Wheat | 10 |
| Hay | 27 |
| Pasture | 110 |
| Woodland and swamp | 200 |
| Homesite, etc. | 30 |
| Total acres | 476 |

The pasturage was used for 30 to 50 head of yearling steers as feeder cattle.

Plaintiff emphasized tobacco on Point Farm because it is a traditional crop in Maryland, the people there being used

2. Taxable years 1938 and 1941 are not available.

to it and knowing how to raise it. It was his idea to raise as good tobacco as possible since tobacco of high quality was sold at good prices, and there was a chance to make a profit. Plaintiff has been trying to improve the quality of the tobacco he raises. Since the growing of tobacco requires extensive irrigation and storage facilities, plaintiff constructed ponds, a sprinkling system and added tobacco barns.

Plaintiff thought of increasing his tobacco production when the above-described acreage restrictions were removed. However, he was prevented from so doing by the shortage of farm labor and the lack of storage space on the farm for additional tobacco, along with the cost of increasing such storage space. Should plaintiff desire to plant greater tobacco acreage, his capital investment in the farm would have to be increased.

When the breeding herd was sold in 1955, plaintiff's farm consultant, John L. King, advised the acquisition of feeder cattle to be fattened with the produce of the farm. Feeder cattle are less expensive than a breeding herd, and do not require as much attention. Also, there was the idea that cattle enrich the soil and nourish a farm. The number of feeder cattle employed was based on the amount of pasture on the farm. The cattle ate entirely from what was grown on the farm, no feed being bought. Although plaintiff sold the cattle for more than he paid for them, there was substantial labor expense. It proved unprofitable to raise the hay and grain and feed it to the cattle. The feeder cattle operation was eventually abandoned in 1969.

During the years when the feeder cattle operation was in process, the excess corn and hay grown on the farm over what the cattle consumed was marketed. On at least one occasion, plaintiff sold some of the trees found on the farm for between $4,000 and $5,000. Lately, the farm has taken advantage of the market for hay offered by the start of a so-called

ranch club with horses for rent near the farm.

At the suggestion of Leroy Beverly, soybeans were raised on the farm for the reason that they are harvested late in the season after the tobacco has been stored. In this way, an attempt was made to distribute the farm's manpower and machinepower throughout the growing season.

From 1956 through 1968, the total cash expenditures [3] of Point Farm exceeded the total farm income, resulting in a cash loss in every year of operation, as follows:

| Year | Total farm income | Total cash expenditures | Total cash losses |
|---|---|---|---|
| 1956 | $ 8,690.67 | $14,199.94 | $ 5,509.27 |
| 1957 | 18,638.12 | 21,555.11 | 2,916.99 |
| 1958 | 17,369.27 | 25,502.28 | 8,133.01 |
| 1959 | 18,179.04 | 18,924.34 | 745.30 |
| 1960 | 8,728.74 | 26,821.13 | 18,092.39 |
| 1961 | 23,226.42 | 28,129.42 | 4,903.00 |
| 1962 | 19,241.40 | 29,212.28 | 9,970.88 |
| 1963 | 23,819.00 | 27,814.08 | 3,995.08 |
| 1964 | 13,858.74 | 23,861.88 | 10,003.14 |
| 1965 | 23,563.46 | 25,992.61 | 2,429.15 |
| 1966 | 17,119.98 | 30,792.46 | 13,672.48 |
| 1967 | 20,355.78 | 31,899.98 | 11,544.20 |
| 1968 | 21,433.67 | 27,637.19 | 6,203.52 |

Point Farm's losses after the deduction for depreciation for the period 1956–1968 were as follows:

| Year | Farm losses per return after depreciation has been deducted | Depreciation expenses |
|---|---|---|
| 1956 | $11,487.51 | $10,824.74 |
| 1957 | 12,057.31 | 10,211.32 |
| 1958 | 17,203.04 | 10,820.03 |
| 1959 | 19,020.90 | 10,320.60 |
| 1960 | 14,545.59 | 10,444.20 |
| 1961 | 18,343.03 | 10,698.03 |
| 1962 | 19,357.25 | 11,462.37 |
| 1963 | 19,732.13 | 10,843.25 |
| 1964 | 17,978.87 | 11,249.13 |
| 1965 | 12,992.01 | 9,298.26 |
| 1966 | 22,991.62 | 8,549.14 |
| 1967 | 24,547.11 | 8,617.91 |
| 1968 | 22,868.22 | 8,571.70 |

In 1932, plaintiff constructed a house on the farm, which he has used infrequently over the years as a residence. In recent years, plaintiff has spent only

3. The total cash expenditures of the farm consist of the sum of the total cattle purchases plus the total farm expenses, as set forth in plaintiff's tax returns.

about 2 weeks each year at the house. The grounds, consisting of 20 acres, contain a swimming pool and a tennis court, and a motor boat is docked on the Patuxent River nearby. The farm and residence properties are physically distinct, although contiguous.

Plaintiff has always kept adequate financial records on the operation of the farm. Separate books are maintained for the operation of the farm and for the operation of the residence house. Bookkeeping records were kept, and are still kept, by Maria Stein, who was an employee of John L. King and Company until that company was dissolved in 1969. Those records were audited by Haskins & Sells, certified public accountants.

Plaintiff meticulously accounted for any milk and other farm products used in the residence house, and paid the farm for such products.

Plaintiff took a personal interest in the operation of Point Farm. He did not follow all of Mr. King's recommendations concerning that operation, but questioned whether they pointed the way toward more economical use of the farm. The resident manager would consult with plaintiff in relation to any increase in wages, or with respect to changing the manner of operation of the farm such as increasing or decreasing the amount of acreage for crops grown on the farm. Plaintiff also had knowledge of both domestic and foreign markets for Maryland tobacco.

Plaintiff consulted with the county agent, a general representative of the Department of Agriculture, for local advice on operating the farm. He contacted the Maryland Forest Service with respect to marketing some of the trees found on the farm. He occasionally wrote to the University of Maryland for some of its pamphlets on tobacco and farm methods, and, for a time, he subscribed to Doane's Agricultural Service.

In February 1965, David Muth, a professional farm manager, met with plaintiff and his wife at Point Farm after an exchange of correspondence beginning in late 1964. Plaintiff indicated that his manager, Mr. King, was getting old and that he would like to take a fresh outlook at his operation at Point Farm. Plaintiff also indicated his desire to make Point Farm pay, that he hoped he could make a profit and that possibly Mr. Muth would be the person who could suggest how to do it.

Section 162 provides that there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. As a regulation thereunder, pertaining to expenses of farmers, Reg. § 1.162–12 provides that a farmer who operates a farm for profit is entitled to deduct from gross income as necessary expenses all amounts actually expended in the carrying on of the business of farming, but that if a farm is operated for recreation or pleasure and not on a commercial basis, and if the expenses incurred in connection with the farm are in excess of the receipts therefrom, the entire receipts from the sale of farm products may be ignored in rendering a return of income, and the expenses incurred, being regarded as personal expenses, will not constitute allowable deductions.

Section 165 provides that there shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise, with limitations on the losses of individuals, the pertinent limitation in this case being that the losses must be incurred in a trade or business. As a regulation thereunder, pertaining to farming losses, Reg. § 1.165–6, provides that if the taxpayer owns and operates a farm for profit in addition to being engaged in another trade or business, but sustains a loss from the operation of the farming business, then the amount of loss sustained in the operation of the farm may be deducted from gross income, if any, from all other sources and that loss incurred in the operation of a farm for recreation or pleasure shall not be allowed as a deduction from gross income.

■ Under these provisions, plaintiff may deduct the losses incurred in the operation of Point Farm in 1962 and 1964 if he operated Point Farm as a trade or business, and not for recreation or pleasure. The ultimate guideline in determining whether a venture is a business rather than a hobby is the presence of a good faith intent to make a profit. Mercer v. Commissioner of Internal Revenue, 376 F.2d 708 (9th. Cir 1967); Lamont v. Commissioner of Internal Revenue, 339 F.2d 377, 380 (2d Cir. 1964); Doggett v. Burnet, 62 App.D.C. 103, 65 F.2d 191, 194 (1933); Charles B. Pennington, 26 T.C.M. 520 (1967). Intention is a question of fact, which must be determined in the light of all the facts and circumstances in each case, including the taxpayer's testimony as to his intent. Harold I. Snyder, 25 T.C.M. 1326, 1333 (1966); American Properties, Inc., 28 T.C. 1100, 1111 (1957), aff'd 262 F.2d 150 (9th Cir. 1958).

■ Plaintiff testified at the trial of this case that he always hoped to make a profit in his operation of Point Farm. While such testimony is, of course, subjective, it should not be ignored when consistent with other objective facts. Farish v. Commissioner of Internal Revenue, 103 F.2d 63, 64 (5th Cir. 1939); Jean A. Lowenthal, 27 T.C.M. 387, 393 (1968); Harold I. Snyder, supra.

■ It is my opinion that the objective facts present herein, including, but not limited to, the following factors relied on by other courts in determining the deductibility of farm losses, support plaintiff's testimony, and indicate that it was at all times material plaintiff's good faith intent to operate Point Farm for profit. It is deserving of comment that plaintiff's demeanor and manner of testifying evidenced integrity, and that no inference is intended from application of objective tests that any doubt lingers as to his credibility as a witness.

From the start, plaintiff employed the services of competent farm consultants and resident farm managers in the operation of Point Farm. Norton L. Smith, 9 T.C. 1150, 1155 (1947); Thomas F. Sheridan, 4 B.T.A. 1299 (1926).

Plaintiff tried to develop a reputation for his breeding herd by showing the animals. Harold I. Snyder, supra, at 1332; Marshall Field, 26 B.T.A. 116, 118 (1932), aff'd, 67 F.2d 876 (2d Cir. 1933), and, in fact, those cattle won a number of local and area prizes over the years.

When the breeding herd failed to produce a profit, and with future prospects dimmed in 1955 by the discovery that a prize young bull purchased for $15,000 at Point Farm was virtually sterile, together with the death of the⁎ man in charge of the breeding operation, plaintiff decided to abandon that operation. See Rose P. Crane, 9 B.T.A. 437, 440 (1927); Thomas F. Sheridan, supra, at 1299.

Thereafter, plaintiff tried to convert his losses into profits. See William L. Brueck, Sr., 23 T.C.M. 1228, 1231 (1964). He emphasized the growing of tobacco, a traditional and, thus, familiar crop in Maryland. At the same time, he installed some feeder cattle to be fattened with the other farm produce. He raised soybeans in an attempt to distribute the farm's manpower and machinepower throughout the growing season.

When the feeder cattle operation failed to produce a profit, it was eventually abandoned in 1969. See Rose P. Crane, supra; Thomas F. Sheridan, supra.

The farm holds itself out to others as engaged in the selling of goods and services. Harold I. Snyder, supra, at 1334. The excess corn and hay grown over what the cattle consumed was marketed. On at least one occasion, plaintiff sold some of the trees found on the farm. Lately, the farm has taken advantage of the market for hay offered by the start of a so-called ranch club nearby.

Plaintiff has always kept adequate financial records on the operation of Point Farm, maintaining separate books for the operation of the farm and for the operation of the residence house. Bookkeeping records were kept by an employee of John L. King and Company, and

are still kept by the same individual now that that company has been dissolved. Those records were audited by Haskins & Sells, certified public accountants. Israel O. Blake, 38 B.T.A. 1457, 1458 (1938). Plaintiff meticulously accounted for any milk and other farm products used in the residence house, and paid the farm for such products. Leland E. Rosemond, 10 T.C.M. 625, 629 (1951).

Plaintiff consulted with the county agent for local advice on operating the farm. He contacted the Maryand Forest Service with respect to marketing some of the trees found on the farm. He occasionally wrote to the University of Maryland for some of its pamphlets on tobacco and farm methods and, for a time, he subscribed to Doane's Agricultural Service. *Leland E. Rosemond, supra,* at 629.

As late as 1965, plaintiff indicated to Mr. Muth, a professional farm manager with whom plaintiff consulted with the idea of taking a fresh look at the operation at Point Farm, his desire to make the farm pay, his hope to make a profit and that possibly Mr. Muth would be the person who could suggest how to do it. James Clark, 24 B.T.A. 1235, 1237 (1931).

■ Pointing to the fact that, in every year of the farm's operation since 1955, total cash expenditures exceeded total farm income, resulting in a cash loss before depreciation, it is defendant's contention that the consecutive record of cash losses under the same plan of operation shows plaintiff's indifference to the profitability of Point Farm. While the relation of receipts to expenditures is an evidentiary fact to be taken into consideration, it is not controlling, but must be weighed against all the evidence. Whitman v. United States, 248 F.Supp. 845, 852 (W.D.La.1965); *Thomas F. Sheridan, supra,* at 1301. A long series of losses without more does not transpose the enterprise from a business into a hobby. Mary E. Turner, 23 T.C.M. 1186,

1191 (1964); John S. Ellsworth, 21 T.C. M. 145, 150 (1962). As indicated above, plaintiff has made changes in the operation of the farm in an attempt to convert losses into profits.[4]

In support of its position that plaintiff did not have the requisite intention to make profits in the operation of Point Farm, defendant contends that plaintiff overcapitalized his investment at Point Farm, which of course, would increase the farm's losses by increasing depreciation deductions. In the first place, there is no substantial evidence that the improvements made by plaintiff to conduct the Angus cattle breeding operation, or those for the production of tobacco, were unreasonably costly. The record as a whole does not establish that plaintiff bought unnecessary machinery or made improvements which were not reasonably required for the successive types of operation which plaintiff conducted on Point Farm. Defendant's expert witness, Mr. Carl R. Baldus, presented an interesting plan as to how Point Farm could have been operated at a profit over the years, had the operation been as a tenant-operated tobacco farm, with rental of houses to others, and with rental of excess acreage out to large area grain producers. Mr. Baldus' plan showed a cash profit before depreciation, but a net loss after depreciation because of the improvements which plaintiff had made to Point Farm.

■ It might be concluded by exercise of hindsight that plaintiff did not operate Point Farm in the most efficient manner possible. However, it is not the quality of plaintiff's judgment in attempting to make Point Farm profitable that is controlling, but the fact that he made a good faith effort. Mercer v. Commissioner of Internal Revenue, supra, 376 F.2d at 711; Lamont v. Commissioner of Internal Revenue, supra, 339 F.2d at 380; Doggett v. Burnet, supra, 65 F.2d at 194; Charles B. Pennington, supra, at 522.

4. It should also be noted that the losses incurred in the operation of Point Farm are not as substantial in terms of that operation as a whole as have been held deductible elsewhere. *Mary E. Turner, supra,* at 1188.