Jean A. Lowenthal v. Commissioner.
Lowenthal v. Commissioner
Docket No. 5375-66.
United States Tax Court
T.C. Memo 1968-79; 1968 Tax Ct. Memo LEXIS 221; 27 T.C.M. (CCH) 387; T.C.M. (RIA) 68079; April 30, 1968. filed *221 Held, petitioner has established (1) that he operated his farm in the taxable year 1963 as a trade or business with a genuine intention of making a profit, and (2) that he sustained a deductible loss from such operation in the amount of $4,626.08. Shale D. Stiller, and Arnold E. Kaufman, 1508 First Nat'l Bank Bldg., Baltimore, Md., for the petitioner. William Morris, for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: Respondent determined a deficiency in income tax for the calendar *222 year 1963 in the amount of $2,678.61. Petitioner assigned one error as follows: A. For the year 1963, the Commissioner erred by disallowing a farm loss in the amount of $4,641.72 for the reason that the loss is not allowable under Section 165 or any other section of the Internal Revenue Code of 1954. Findings of Fact Some of the facts were stipulated. The stipulation, together with all of the exhibits attached thereto, is incorporated herein by reference. Petitioner is an individual and at the time of filing the petition herein resided at Finca El Coronel, Churriana, Malaga, Spain. He filed his Federal income tax return for the calendar year 1963 with the Director of International Operations in Washington, D.C. On this return petitioner deducted a 388 farm loss in the amount of $4,641.72 which, in a separate sheet attached to the return, he explained thus: PROFIT OR LOSS FROM FARM
Loss per Schedule F attached
($6,631.03)
Less 30% disallowed under Sec. 911(a)(1) 1,989.31
Loss allowed ($4,641.72) In a statement attached to the deficiency notice the respondent disallowed the claimed loss with this explanation: (a) The farm loss claimed in *223 your return in the amount of $4,641.72 is disallowed for the reason that you have failed to show that the loss is allowable under section 165 or any other section of the Internal Revenue Code. Prior to World War II petitioner lived in Maryland and rented two farms. After the war he bought a small farm in Delaware and supervised the operation of the farm for approximately 4 years. He produced truck crops on the Delaware farm and raised chickens on the farms in Maryland. During the time petitioner operated the Delaware farm, he was able to show a small profit. In 1955 petitioner left the United States and took up residence in Spain. In 1956 he purchased a tract of approximately 17 acres in southern Spain, about 3 miles inland from the Mediterranean Sea between the cities of Malaga and Torremolinos, at a cost of $20,000, or 840,000 pesetas. At that time, the official rate of exchange between United States dollars and Spanish pesetas was 42 pesetas for one dollar. This tract had been operated solely as an olive farm and had on it about 2,000 olive trees that were from 500 to 1,000 years old. This olive farm was completely surrounded by other farms. Petitioner has maintained his principal *224 place of residence at this property from 1956 to the date of the hearing herein. Petitioner has not been engaged as an employee in any capacity during the years 1956 through and including 1963. The official rate of exchange in 1963 between United States dollars and Spanish pesetas was 60 pesetas for one dollar. Paragraphs 7 and 8 of the stipulation are as follows: 7. Petitioner's operation of the property in question, as reported on Schedule F of his Federal income tax returns for the years 1957 through 1966, reflects the following: (such amounts are explained in detail by the accompanying chart attached hereto and made a part hereof as Exhibit 2-B) [1]
Year
Gross Income
Expense
Net Profit orLoss
1957
$1,140.00
$4,805.00
($ 3,665.00)
1958
230.77
5,153.65
(4,922.88)
1959
250.00
6,325.91
(6,075.91)
1960
740.00
6,530.21
(5,790.21)
1961
375.00 6,373.67
(5,998.67)
1962
780.00
6,718.67
(5,938.67)
1963
550.00
7,181.03
(6,631.03)
1964
420.00
7,471.03
(7,051.03)
1965
965.00
7,862.50
(7,007.50)
1966
870.00
6,572.11
(5,702.11)
*225 8. In each year, 1957 through and including 1966, Petitioner, pursuant to Section 911(a)(1) of the Internal Revenue Code of 1954, has reduced the claimed loss from the operation of his property by 30 percent on his respective Federal income tax returns. For the taxable year 1963, Exhibit 2-B mentioned in paragraph 7 of the stipulation is as follows: 1963
Farm Income:
Olives $ 550.00
Total Farm Income
550.00
Farm Expenses and Deductions:
Labor
2,300.00
Storm damage
200.00
Feed
650.00
Seeds and plants
300.00
Repairs and maintenance
400.00
Fertilizer
250.00
Veterinary
160.00
Gasoline
600.00
Taxes
150.00
Insurance
20.00
Utilities
700.00
Freight, express, trucking
100.00
Supplies
200.00
Legal and accounting 300.00
Total Farm Expenses
6,330.00
Add: Depreciation 851.03
Total farm expenses and deduc- tions 7,181.03
Net loss
(6,631.03)
Less: 30% disallowed under sec. 911(a)(1) 1,989.31
Net loss deducted per return
($4,641.72)
At the time petitioner purchased the olive grove there water well and 389 an antiquated electric system. Petitioner was challenged by the looks of the farm and acquired *226 it with the intention of making it productive. He has from 1956 to the present time devoted most of the daylight hours, 7 days a week, to working the farm. As soon as he moved on the farm, he immediately began to make improvements to make the farm productive. He first lined the old well and dug it deeper in order to obtain more water. Petitioner wanted to put in animals and plant fodder to feed the animals. In view of the small amount of rainfall in southern Spain, crops would need some form of irrigation to obtain the necessary water. In order properly to irrigate his farm, petitioner built four reservoirs. After repairing the old well, petitioner realized he could not obtain sufficient water from this well to aid in his irrigation plans. Petitioner then discovered an old abandoned well on his property which he opened and, after digging it deeper, he found an abundance of water. In order to operate the water pump, petitioner erected an electric building and installed a 30-kilowatt transformer capable of producing 30,000 watts of electrical power. Petitioner then laid pipes connecting the reservoirs to the wells and also from the reservoirs to the fields which he intended to irrigate. *227 The reservoirs had a capacity of between 200,000 and 400,000 liters of water. Once the irrigation system was constructed and ready for use, petitioner began to cultivate his land. He planted citrus groves, grain, and fodders. He purchased cows, pigs, sheep and chickens, all with the idea of supplementing his olive production. Petitioner remodeled and repaired the tenant house to make it livable and he also remodeled his residence. He also repaired the roads leading to and from his farm, as well as repairing the stone wall surrounding his property. He also installed a telephone, which was a necessity for his farm operation. In order to accomplish his aims, petitioner purchased different kinds of farm equipment, including wagons, tools, and sprays. He also purchased farm animals such as mules and horses to do the farm work. In order to provide suitable quarters for his animals, petitioner built stables, pig sties, and a new barn. Throughout all the years petitioner has owned and operated his farm, he has employed three full-time farm laborers. The duties of the three farm laborers included taking care of the animals, olive grove, irrigation system, and all the daily chores normally *228 associated with the running of a farm. The three farm laborers do not devote any of their time, except to some de minimis extent, to work on or in the residence of the petitioner. Petitioner also employed servants for the care of his residence. The wages paid to these servants were not taken by petitioner as a deduction on his 1963 income tax return. During harvest time petitioner would sometimes employ additional help to operate the farm. On an annual basis, the olive grove requires constant care. Involved in the care of the olive grove are fertilizing at least twice a year, plowing the grove, clearing each tree, removing weeds from around the trees, covering each tree with dirt to protect the roots from the sun, harvesting in the fall, and pruning the trees after harvest. To protect the olive trees from insects, petitioner had the grove sprayed and the trees whitewashed as often as was necessary. Petitioner participated in the manual labor on the farm as well as supervised all operations. He made all the purchases of seed, feed, and other needed farm supplies. Ever since the day petitioner purchased the farm, he has been confronted with an extraordinary series of circumstances *229 and events which have prevented his farm operation from showing a profit. First, petitioner was confronted with a shortage of fertilizer. It was not until recently that an American company built an artificial fertilizer plant near petitioner's farm enabling petitioner to obtain not only all the fertilizer he needed but also to obtain professional and technical assistance in selecting proper fertilizer. Petitioner has been frustrated by the weather conditions of southern Spain such as the lack of rain. Petitioner has suffered because of the instability of the markets in Spain, as well as from the fact that he was a foreigner. One of petitioner's worst setbacks concerned his citrus groves. In 1957 or 1958 petitioner purchased 500 orange trees and planted them on his farm. Most of these trees were saplings which had been grafted. The trees were one year old. After petitioner planted his trees he learned that it would have been better to purchase saplings which had not been grafted as the root system develops much quicker and the tree is a healthier tree. The grafted trees which petitioner planted did not develop properly. In a continuing effort to improve his farm, 390 petitioner *230 decided to regraft all the orange trees to lemon trees. The first year after petitioner had regrafted his orange trees to lemon trees the market for lemons dropped from 8 pesetas per kilo to 2 pesetas per kilo. One kilo equals 2.2 pounds. Some time prior to 1963 petitioner learned that his neighboring farmers were going to graft their lemon trees to orange trees through the assistance of technicians from Valencia. He then requested his neighbor to send the technicians down to his farm with the aim of regrafting his lemon trees back to orange trees. Petitioner did regraft his lemon trees back to orange trees. After his second graft by petitioner, the trees began to grow beautifully and showed signs of developing into a productive grove. However, before the winter was over, a severe storm came in from the Mediterranean Sea carrying salt in its high winds. The salt and the severe winds destroyed the entire citrus grove as well as burned most of the foliage of the olive trees. Petitioner's citrus grove was set back 2 years by this storm. As a result, petitioner has not as yet sold fruit from this orchard. Petitioner also met disaster with his development of pigs for sale. In 1958 he *231 purchased a breed of pigs known as "Large Whites." He intended to develop and breed the pigs for eventual sale to supplement his farm income. From the beginning, petitioner was confronted with unhealthy pigs which even the services of a veterinarian could not cure. After petitioner bred the pigs, the number of pigs per litter was far below what petitioner expected. Furthermore, the brood sows killed a large number of the newly born pigs. Petitioner was able to sell some of the pigs in 1961 and 1962. Thereafter, petitioner's pigs were hit with a disease known as "African Pest" which not only wiped out his entire stock of pigs but also those of his neighbors. Petitioner then decided to find a breed of pigs which could withstand African pest disease. He then purchased a breed of pigs known as "Portuguese Pigs." He purchased 5 sows and a boar. When it came time to breed the pigs, petitioner looked for a different boar so as to introduce a new bloodline to make the new litter stronger. This was necessary because the boar he originally purchased was the brother of the sows. When petitioner could not find another boar, he bred his sows with his boar, which resulted in getting a litter of *232 weak pigs because of their being too closely bred. These weak pigs did not grow properly and after some time petitioner was forced to sell them at a great loss. Immediately after the severe windstorm that ruined petitioner's citrus and olive groves, he planted a line of cyprus trees to protect the future growth of his groves. Petitioner has constantly sought advice of experts in all fields of farming to aid him in making his farm productive. For example, petitioner, on numerous occasions, would discuss his problems with his neighboring farmers to try and find common solutions. In 1962 petitioner began to purchase cows with the aim of going into the milk business. Starting in 1965 petitioner began to sell various dairy products, including eggs. Petitioner does not use his farm as a "show place." The farm does not have any recreational facilities such as tennis courts. Petitioner used one of the reservoirs as a place to swim, but the farm did not have a swimming pool as such. Petitioner did not give large parties at his farm. Petitioner's residence on the farm is not suitable for accommodating a large number of guests for any length of time. The farm is not a tourist attraction; *233 neither does the farm improve the social position of petitioner in Spain. Petitioner does not consider himself a "wealthy" man. His main source of income is from the Read Drug and Chemical Company in the form of dividends. Aside from his farm operations, petitioner reported the following income on his return for 1963: Dividends from Read Drug and Chemical Company
$30,351.93
Dividends from Mercantile Safe Deposit & Trust Co
477.60
Dividends from Estate of Rita N. Myers
803.55
Trustee Commissions from Estate of Rita N. Myers
396.01
Other income from Estate of Rita N. Myers 4,080.66
Total
$36,109.75
Since owning the farm petitioner has constantly been trying to improve it. Petitioner works on his farm to make it profitable and does not consider the farm to be a hobby. Petitioner still believes that his farm will become productive and has never abandoned his original intention of operating his farm on a productive basis. Petitioner 391 intends to continue to operate the farm to make it productive and has no present intentions of selling the farm. Facts Especially Applicable to 1963 Petitioner's operation of the farm in 1963 was similar in all respects *234 to the manner in which he operated it in earlier years. Except for a short trip to England, petitioner spent all his time and energy on the farm in 1963. He sold 8,000 kilos of olives for 4 pesetas per kilo which, when translated into dollars, represents approximately $550. The production of olives in 1963 was not anywhere near the potential production of petitioner's olive grove. An olive tree is capable of producing 50 kilos of olives. Petitioner's olive grove has the capability of producing 100,00 kilos of olives. With that capacity and with the market price of 6 pesetas per kilo, petitioner could realize $10,000 from the production of olives. Since petitioner has had his farm, the price of olives has been as high as 8 pesetas per kilo. During 1963 petitioner had three full-time farm employees who worked all year performing the same daily chores they had performed in earlier years. During 1963 petitioner paid his three farm employees 2.175 pesetas each week for 52 weeks, or 113,100 pesetas for the year. Petitioner also paid his three farm employees, per Spanish law, 4 weeks' extra pay and 2 weeks' pay for vacation, for a total of 13,050 pesetas. In 1963 petitioner paid 90 pesetas *235 per man per month as social security and 2,000 pesetas for all three men for insurance, for a total of 5,240 pesetas. Petitioner also paid 12,000 pesetas to an additional man who harvested his olive crop in 1963. For overtime work petitioner paid during 1963 5,000 additional pesetas to his three employees. Petitioner paid for labor on his farm in 1963 a total of 148,390 pesetas, which is $2,473.16. In 1963 petitioner sustained damage to his farm property resulting from severe storms. The damage was to the roads and farm buildings. The amount of the damage claimed by petitioner was $200. The amount of the damage was $200. During 1963 petitioner spent 59,376 pesetas, or $989.60, for feed for his farm animals. During 1963 petitioner spent 11,000 pesetas, or $183.33, for seed and plants for his farm. During 1963 petitioner spent 16,859.80 pesetas, or $281, for repairs and maintenance to his barns, pig sties, gates and wire enclosures for his animals, reservoirs, wells and electrical equipment. No part of this $281 was spent on petitioner's residence. During 1963 petitioner spent 12,000 pesetas, or $200 for fertilizer for his olive grove. During 1963 petitioner spent 7,620 pesetas, *236 or $127, for veterinary services and medicine for his animals. During 1963 petitioner spent 31,200 pesetas, or $520, for gasoline used on his farm for farm purposes only. During 1963 petitioner spent 8,600 pesetas, or $143.33, for taxes on his farm property. During 1963 petitioner carried automobile insurance on the automobile he used on his farm for farm puropses. The cost of such insurance to petitioner was $225. The amount of insurance claimed by petitioner was $20. During 1963 petitioner spent 31,718.50 pesetas and 1,121.10 pesetas for electricity and telephone, respectively, or $547.33, 85 percent of which, or $465.23, was for his farm purposes only. During 1963 petitioner spent some amount for freight, express, and trucking on items for the farm he had purchased and which items were too large for petitioner to carry in his automobile. Spain has no free delivery service on purchases. The amount claimed by petitioner in his return was $100. The amount spent by petitioner was at least $50. During 1963 petitioner spent $200 for supplies, such as tools, a wheelbarrow, harness, ploughs, etc., which supplies were used on his farm. During 1963 petitioner spent at least *237 $2,500 for legal and accounting services. At least $150 of this amount pertained to his farm. The remainder was personal. During 1963 petitioner spent 6,000 pesetas, or $100 to heat the house provided for his farm employees, no part of which was claimed on his return. During 1963 petitioner sustained $851.03 of depreciation on property used in the operation of petitioner's farm. Ultimate Findings During the taxable year 1963 petitioner was engaged in the business of farming with an intent to make a profit from the operation of the farm. During the taxable year 1963 petitioner sustained a deductible loss from the 392 operation of his farm in the amount of $4,626.08, after applying paragraph 8 of the stipulation. Opinion The sole issue is whether the respondent erred in disallowing a farm loss claimed by petitioner on his Federal income tax return for the taxable year 1963 in the amount of $4,641.72. The applicable sections of the statute are sections 165 and 162 of the Internal Revenue Code of 1954, the material provisions of which are in the margin. [2]
*238 Respondent contends: (1) that petitioner did not operate his property as a farming venture with the requisite profit motives but, rather, as a country estate with some insignificant and incidental farm-like activity; and (2) that, in any event, petitioner has failed to substantiate any of his claimed expenses allegedly incurred in connection therewith. We do not agree with either contention for the reasons given below. Respondent's First Contention. Many cases have been cited by the parties in their briefs involving questions of the kind here involved. The cases substantially agree on the broad principles to be applied. In order that a claimed farm loss be allowed, the taxpayer must establish that he was engaged in the business of farming, with a genuine intent of making a profit therefrom. He must not conduct the farm as a hobby or for personal pleasure. Theodore Sabelis, 37 T.C. 1058; Israel O. Blake, 38 B.T.A. 1457. In the latter case we said: The whole question here is to determine whether, as a matter of fact, the intention of the petitioner has been *239 to realize a profit from the operation of this farm, and this question may not be determined solely from the recurrence of losses. Commissioner v. Field, 67 Fed. (2d) 876; Whitney v. Commissioner, 73 Fed. (2d) 589; Commissioner v. Widener, 33 Fed. (2d) 833. We are satisfied from the entire record that such was his intention and that the Commissioner erred in concluding that he conducted the farm as a hobby or for personal pleasure. * * * The cases are also in agreement that the question is a factual one to be decided on the evidence presented, and that the intention of the taxpayer is paramount. Morton v. Commissioner, 174 F. 2d 302 (C.A. 2, 1949), affirming a Memorandum Opinion of this Court, certiorari denied 338 U.S. 828 (1949); Norton L. Smith, 9 T.C. 1150. In the latter case the Commissioner disallowed certain farm losses in 1942 and 1943. In reversing the Commissioner, we said: It is true that the petitioner has experienced continuous annual losses from the operation of his farm since its acquisition in 1933 and through the taxable years in question. Moreover, the record discloses that after *240 the taxable years involved here there were further losses in 1944, 1945, and 1946. The fact that the operation of the farm has resulted in a series of losses, however, is not controlling if the other evidence shows there is a true intention of eventually making a profit. * * * Petitioner testified as to his "intention" in part as follows: Q What did you intend to do with the property after you purchased it? A I looked at it and I was challenged by it and I decided to buy it and to make it productive, to try to make it productive. Q Productive in what way? A That I could make money there to support myself in Spain. * * * Q Mr. Lowenthal, would you say that the operation of the farm is a hobby with you? A Categorically, no. Q Why not? A Because I work there. I work it to make money. Q How many hours do you spend working on the farm? A When I am there, I am there most of the year, I spend five or six hours a day out there. Q How many days a week? A That is seven days a week. * * * 393 Q Do you still hope that your farm will show a profit? A I do. Q Have you ever given up hopes to make your farm profitable? A I have not. Q Do you think it is reasonable *241 to think that your farm will show a profit? A I certainly do. Q Mr. Lowenthal, assuming all conditions were ideal, could your farm in its present operation show a profit? A It can. Q Could it have done so in 1963? A Yes. * * * Q Mr. Lowenthal, do you still intend to continue to keep the farm? A I do. Q What are your intentions with regard to the future operations of the farm? A I intend to run the farm at a profit. Petitioner's testimony as to his intention, being subjective, is not conclusive and may be rebutted by objective circumstances which are inconsistent therewith but it should not be ignored when it is consistent with other proved objective facts. Cf. Margit Sigray Bessenyey, 45 T.C. 261, affirmed 379 F. 2d 252 (C.A. 2, 1967). We believe that the objective facts support petitioner's testimony that the expectation of an ultimate profit is reasonable under all the circumstances. Petitioner was devoting practically all of his time to making his operations profitable. He had three full-time employees. These employees devoted their time exclusively to the operation of the farm. Petitioner purchased the farm with an intention to *242 make it productive. That intention has never changed. He constantly made improvements and invested additional capital. He tried one experiment after another. He sought advice from others. All this, we think, indicates a true business operation. The farm was not a showplace. Petitioner was by no means a "gentleman farmer." He has spent a good part of his adult life on farms. The farm was not a hobby with him. He has had no other employment or occupation during all the time he has owned the farm in Spain except he did try to write some novels at night which did not sell. He came to the farm in Spain with many years of previous experience from his prior farm ventures, one of which, in Delaware, was a profitable operation. Although petitioner did have a source of dividend income, he was by no means a "wealthy" man who could afford to sit back and allow his losses on the farm to continue. He did not act indifferently to the losses each year from his farm operation. On the contrary, he took every measure he knew of or was advised of to correct the situation with the aim and intention of making his farm productive. Once again the record clearly reveals that petitioner has been hit consistently *243 with drought or severe storms causing damage to his crops and disease causing destruction of his animals. Had it not been for the severe wind and rainstorm that came in from the Mediterranean Sea, petitioner's citrus grove would probably have produced fruit a few years after it was planted. Petitioner's effort to raise pigs was severely hampered by the disease known as "African pest." The record further reveals that petitioner's olive grove has the potential of producing enough olives to show a profit without the need of any sales of petitioner's other crops. However, petitioner has not been able to harvest a crop of olives anywhere near its potential. This inability has been caused by drought, storm damage, and the use of the wrong fertilizer. Respondent refers to petitioner's 10 years of consecutive losses, and argues that these are a strong indication of a lack of the requisite profit motive. It is true that the continuing lack of profits is an important factor bearing on the taxpayer's true intention. Deering v. Blair, 23 F. 2d 975 (1928), affirming 5 B.T.A. 1055; Thacher v. Lowe, 288 Fed. 994 (S.D.N.Y.); Margit Sigray Bessenyey, supra. *244 But it is also true that a record of continual losses over a series of years does not in itself preclude the allowance of such losses. Marshall Field, 26 B.T.A. 116, affirmed 67 F. 2d 876 (C.A. 2, 1933); George D. Widener, 8 B.T.A. 651, affirmed 33 F. 2d 833 (C.A. 3, 1929). The test is whether the evidence in the particular case shows that there is a true intention of eventually making a profit. Norton L. Smith, supra; Hirsch v. Commissioner, 315 F. 2d 731, 736 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court. We think such evidence is present in the instant case. As we said in an early case, Samuel Riker, 394 Jr., Executor, 6 B.T.A. 890, 893 (1927): If losses, or even repeated losses, were the only criterion by which farming is to be judged a business, then a large proportion of the farmers of the country would be outside the pale. It is the expectation of gain, and not gain itself which is one of the factors which enter into the determination of the question. * * *. The Government has examined petitioner's returns for all years prior to 1963 as to whether the operation *245 of petitioner's farm was a business or a hobby and in all years prior to 1963 it has accepted petitioner's operation of the farm as a business. In summary, we find that all the factors which the courts have required in finding that a particular farm venture is carried on as a business for profit are present here. When petitioner's testimony regarding his intentions is taken, together with an objective analysis of what petitioner did during the years he held the farm, the conclusion must inescapably be that he operated his farm as a business for profit and we have so found as an ultimate fact. Respondent's Second Contention: The amount of the loss in 1963 is a matter that should have been stipulated. In paragraph 7 (Exhibit 2-B) of the stipulation set out in our findings, the parties have stipulated and "explained in detail" all the items of farm income and expenses "as reported on Schedule F of his [petitioner's] Federal income tax returns for the years 1957 through 1966." See Footnote 1, supra. In his deficiency notice for 1963 the respondent merely advised petitioner that "[the] farm loss claimed in your return in the amount of $4,641.72 is disallowed for the reason that *246 you have failed to show that the loss is allowable under section 165 or any other section of the Internal Revenue Code." In his opening statement, counsel for the respondent said: The disallowance is predicated in part on the petitioner's failure to offer one iota of substantiation regarding the claimed expenses and his further inability to provide even a scintilla of evidence showing that he has ever been or is now engaged in the business of farming for profit. The evidence offered by petitioner not only pertained to establishing that the farm was operated as a business with a genuine intention of making a profit but pertained to establishing the amount of each item of income and expense. In connection with the latter, the respondent, in his main brief, says that the evidence offered by petitioner to show the amounts of his expenditures and depreciation "is patently inadequate." We do not agree. In our findings we have found the amount we think petitioner has established for each of these items. Some of these amounts were a little more than claimed on the return and some were a little less. The amounts for the three items of (1) storm damage, (2) freight, express, and trucking, *247 and (3) legal and accounting were determined in accordance with the evidence and the principles established in Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). The net result of our findings and which we have found as an ultimate finding is that during the taxable year 1963 petitioner sustained a deductible loss from the operation of his farm in the amount of $4,626.08, after applying paragraph 8 of the stipulation. We find and hold that petitioner is entitled to a farm loss deduction in 1963 in the amount of $4,626.08. Decision will be entered under Rule 50. Footnotes
1. Exhibit 2-B is captioned "Schedule of Farm Income and Deductions Years 1957 to 1966, Inclusive" and purports to show in detail 8 items of farm income and 23 items of farm expenses and deductions (including depreciation) in columnar form for each of the years 1957 through 1966, with a column showing the "total" of such income and expenses for the 10-year period.↩
2. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business * * * SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *↩