FLOYD E. FISHER and PATRICIA J. FISHER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fisher v. Commissioner
Docket No. 10273-78.
United States Tax Court
T.C. Memo 1980-183; 1980 Tax Ct. Memo LEXIS 406; 40 T.C.M. (CCH) 398; T.C.M. (RIA) 80183; May 21, 1980, Filed Floyd E. Fisher and Patricia J. Fisher, pro se. Timothy M. Cotter, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined a deficiency in petitioners' income tax for the taxable year 1975 in the amount of $2,291.36. A *408 concession having been made by petitioners, the sole issue before us is whether petitioners' farming activity in 1975 constituted a trade or business or an "activity not engaged in for profit," within the meaning of section 183(a). [1]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and stipulated exhibits are incorporated herein by this reference. Petitioner Floyd E. Fisher resided in Jamesville, New York, and petitioner Patricia J. Fisher resided in Syracuse, New York, at the time the petition herein was filed. During the years 1970 through 1976, petitioners were married to each other; they have since divorced. Petitioners timely filed their Federal income tax returns for the taxable years 1971 through 1976. [2]
Prior to her marriage to Floyd E. Fisher and continuing at least until trial, petitioner Patricia Fisher was employed as a technician, on a full-time basis, by Bristol Laboratories, Division *409 of Bristol-Myers Co. Petitioner Floyd Fisher (hereinafter Fisher) owns, and owned at least during 1971 through the date of trial, a 119-acre farm in Jamesville, New York. The farm consists of approximately 110 acres of tillable land and 8 to 10 acres of woods. In the early 1960's, Fisher, an only child, inherited this farm from his father, who had operated the farm since at least 1929. Fisher graduated from high school in 1947. From 1947 to approximately 1950, he worked in a dairy or milk plant. During those years, he also assisted his father in operating the farm, as he had since his youth. In 1950, Fisher bought a milk route, which he operated until at least 1952. In February 1952, Fisher began shipping and selling milk from cows that he had purchased and/or raised, which he maintained on the farm. Since he was a child, he had wanted to be a farmer. In 1969, Patricia Fisher began living on the farm and assisting Fisher in its operation. Fisher ruptured a disc in his back in the winter of 1969-1970. It was his second ruptured disc; he had also injured his back in 1947. His son, who had graduated from high school in 1969 and then continued his education in nearby *410 Morrisville for two years, left home for a job in Wisconsin in August 1971. Fisher kept his dairy cows until February 1972, with the aid of hired help, but was unable to continue milking. At that time, he sold all the cows which produced milk, two bulls used in the dairy operation, and a bulk tank used to store milk produced by the cows. After selling their dairy cows, petitioners still maintained additional animals on the farm. They purchased and raised some cattle to be sold for beef, including one a year used for personal consumption. Fisher considered going back into the dairy business with the cows he was raising, but had not done so as of the date of trial. Petitioners also had horses on the farm. Fisher had had two pet ponies since 1954, which died in 1974. Around 1974, he obtained a pair of sorrels to be used as work horses. He was not able to break the horses for use in farming until some time subsequent to 1975. Petitioners fed their animals with hay and grain grown on the farm, but were forced to also purchase special feed for the calves. Much of their crop remained on the farm after harvesting for this purpose, rather than being sold. Fisher had been married *411 prior to his marriage to Patricia Fisher. As a result of his divorce from the prior wife, he had been required to make payments totaling $18,000. In order to have extra income with which to pay his bills, Fisher began working part-time as a bus driver for the James L. DeWitt Central School in the spring of 1972. That autumn, he began work for the La Fayette Central School District, La Fayette, New York, as a light mechanic and substitute bus driver. This position, which required him to work generally 40 hours per week, continued until April 1977, at which time he reinjured his back. He continued running the farm with the aid of hired help and by working on the farm each day before and after his job with the school district. He no longer is employed outside of the farm. During 1975, heavy storms destroyed much of the first planting of crops, necessitating a second plowing with attendant increased expense. Also, in May 1975, Fisher fractured his pelvis, when he fell off his tractor; his neighbors helped out in running the farm and received half of the crop for so doing. Fisher's farming operations had been profitable in 1971, but after he sold the dairy cows, he never again *412 showed a profit (aside from the gain on his sale of the dairy cows, bulls, and bulk tank in 1972). He reported on his tax returns the following receipts and deductions (amounts have been rounded off): 1971
1972
1973
1974
Receipts: Dairy Products
$27,325
$ 1,718
$ $ Grain, Oats, Hay
400
850
1,982
Miscellaneous
453
150
Reported Gross Profit
$27,778
$ 2,118 *
$1,000
$1,982
Deductions
26,142
10,523
6,074
6,994
Farm Income (Loss)
$ 1,636
($ 8,405)
($5,074)
($5,012)
1975
1976
1977
Receipts: Dairy Products
$ $ $ Grain, Oats, Hay
458
2,082
Miscellaneous
113
104
Reported Gross Profit
$
$ 571
$2,186
Deductions
11,431
9,744
9,920
Farm Income (Loss)
($11,431)
($9,173)
($7,734)
On his tax returns, Fisher individually reported no nonfarm income in 1971, but he reported nonfarm income of $1,086 in 1972 and $6,292 in 1977. On their joint returns, petitioners reported the following amounts of nonfarm income in 1973 through 1976: Patricia J.
Interest/
Fisher
Fisher
Dividends
Total
1973
$8,180
$ 7,489
$220
$15,889
1974
9,163
9,328
146
18,637
1975
9,099
10,620
50
19,769
1976
9,027
14,693
28
23,748
*413 OPINION The only issue presented is whether petitioners' farming activity in 1975 constituted an "activity not engaged in for profit" under section 183(a). Section 183(a) provides that "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(b)(1) allows those deductions which would be allowable without regard to whether or not such activity is engaged in for profit. Section 183(b)(2) provides that deductions which would be allowable only if such activity is engaged in for profit shall be allowed "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)." Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." The test for determining whether an activity is engaged in for profit is whether the individual engaged in the activity with the primary purpose and intention of making a profit; the taxpayer *414 must have a bona fide expectation of realizing a profit, although such expectation need not be reasonable. Section 1.183-2(a), Income Tax Regs.; Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), on appeal (9th Cir., Aug. 31, 1979). Whether the petitioners had the requisite intention is a question of fact to be determined on the basis of all the facts and circumstances. Allen v. Commissioner, 72 T.C. 28, 34 (1979); Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. on another issue 607 F.2d 995 (2d Cir. 1979). The burden of proof is on the petitioners, Golanty v. Commissioner, supra at 426; Boyer v. Commissioner, 69 T.C. 521, 537 (1977), on appeal (7th Cir., July 7, 1978), with greater weight given to objective facts than to the petitioners' mere statement of their intent. Section 1.183-2(a), Income Tax Regs.; Engdahl v. Commissioner, supra at 666; Churchman v. Commissioner, 68 T.C. 696, 701 (1977). See. H. Rept. 91-413 (Part 1), 1969-3 C.B. 200, 245; S. Rept. *415 91-552, 1969-3 C.B. 423, 490. No one factor is conclusive and thus we do not reach our decision herein by merely counting the factors enumerated in section 1.183-2(b), Income Tax Regs., which support each party's position. Dunn v. Commissioner, supra at 720. We found the petitioners to be candid, honest, and totally believable witnesses and we are satisfied that they subjectively intended to derive a profit from their farming activity. The question which we must therefore resolve is whether the weight of objective factors negates their intention. Our examination of the facts and circumstances herein is colored by the legislative history of section 183. This section was added to the Code as section 213 of the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 571, to prevent high income taxpayers from profiting through the harvesting of their taxes rather than their farms. In enacting this section, Congress intended to codify the distinction between a business and a hobby drawn by prior case law and the prior hobby loss statutory provision (section 270) which was considered inadequate. H. Rept. 91-552, 1969-3 C.B. at 489. The House *416 bill would have limited deductions in the case of any activity not carried on with "a reasonable expectation of realizing a profit." H. Rept. 91-413, supra; H.R. 13270, 91st Cong., 1st Sess., sec. 213, 115 Cong. Rec. 21798. The Senate bill rejected this and substituted the simple test of an activity "not engaged in for profit." The Senate Finance Committee report stated that the purpose of the change was to prevent-- the rule from being applicable to situations where many would consider that it is not reasonable to expect an activity to result in a profit even though the evidence available indicates that the activity actually is engaged in for profit. For example, it might be argued that there was not a "reasonable" expectation of profit in the case of a bona fide inventor or a person who invests in a wildcat oil well. A similar argument might be made in the case of a poor person engaged in what appears to be an inefficient farming operation. The committee does not believe that this provision should apply to these situations or that the House intended it to so apply, if the activity actually is engaged in for profit. S. Rept. 91-552, 1969-3 C.B. at 489-490. *417 (Emphasis added.) The Conference Committee adopted the Senate version (H. Rept. 91-782, 1969-3 C.B. 644, 657), and it subsequently became section 183 of the Code. The legislative history thus shows a recognition of the losses that real farmers often incur, along with a concern to close a loophole. [3] Respondent's regulations similarly recognize the problems faced by real farmers. In particular, one of the examples discusses the situation in which a farm on which the taxpayer did much of the required labor was not profitable for 15 years because of the rising costs of operating farms, yet the activity of farming could be found to be engaged in for profit. Section 1.183-2(c), Example (4), Income Tax Regs. [4] While some of the facts in the instant case may be distinguishable from those in the example, we think the distinctions less important than the similarities as regards the policy behind it. *418 Admittedly, petitioners' record keeping for the years subsequent to 1971 was somewhat deficient in failing to record receipts, and there is very little evidence of any effort to improve operations. Compare Golanty v. Commissioner, 72 T.C. at 430. At the same time, the record indicates that the primary thrust of the operation was to keep petitioners' heads above water in a desperate situation. In this latter context, we attach less significance to the fact that Fisher's injury and the weather problems in 1975 merely increased petitioners' losses, rather than prevented the farm from showing a profit in that year (one in which they reported no gross income from farming). Similarly, we discount the impact of the change in 1972 from a profitable dairy operation into a losing proposition, because it was necessitated by Fisher's back injuries. The fact is that a very real attempt was made to continue the remainder of the farm operations as before. Although Fisher had another job from 1972 through 1977 at which he worked during most of that period 40 hours per week, he continued running the farm by attending to the chores before and after work (as did Particia Fisher), *419 aided sporadically by hired help. On the other side of the coin, we attach considerable significance to the fact that Fisher's life was farming. He persevered in his attempts to profit at it despite rising costs, both by planting crops and by even trying again to raise cattle, possibly for dairy purposes. Petitioners' receipts from the sale of crops were so low because much of the crops was used to feed the young stock. He has not given up, although he now has no outside employment against which to offset his losses. Moreover, petitioners are not affluent individuals interested primarily in having the tax collector share in their farm losses. Cf. section 1.183-2(b)(8), Income Tax Regs.; Engdahl v. Commissioner, 72 T.C. at 670. [5] We are convinced that Fisher obtained outside employment (and the resulting nonfarm income) in order to offset his farm losses, rather than the converse. [6] Thus, the instant case is distinguishable on its facts from those cases relied on by respondent in which the taxpayers engaged in their loss activities while living comfortably on their outside incomes. Golanty v. Commissioner,supra;Dunn v. Commissioner,supra; *420 Jasionowski v. Commissioner, 66 T.C. 312 (1976); Benz v. Commissioner, 63 T.C. 375 (1974); Bessenyey v. Commissioner, 45 T.C. 261 (1965), affd. 379 F.2d 252 (2d Cir. 1967). [7] Finally, we think it unlikely that petitioners would continue an activity costing them thousands of dollars and entailing so much personal labor without a profit motive. Engdahl v. Commissioner,72 T.C. at 670. The long and the short *421 of the matter is that we think that, on balance, the objective factors, including the bleak financial picture of the farm activities after 1972, are more explainable in terms of inefficient operations, which the Senate had in mind when it liberalized the "reasonable expectation" standard to that of an activity "not engaged in for profit," than in terms of negating the petitioners' expectation of profit. Hindsight leading to a conclusion of lack of efficiency should not cause us to substitute our judgment for that of a taxpayer who has made a good faith effort. See Jefferson Patterson v. United States, 198 Ct. Cl. 543, 556, 459 F.2d 487, 494 (1972). Based upon the record as a whole and after considering all the facts and circumstances, we hold that petitioners engaged in their farming activities in 1975 with a bona fide expectation of making a profit. [8]
To reflect a concession by petitioners, Decision *422 will be entered under Rule 155. Footnotes
1. All section references, unless otherwise indicated, are to the Internal Revenue Code of 1954, as amended and in effect in 1975.↩
2. Petitioners filed individual returns for 1971 and 1972 and joint returns for 1973 through 1976.↩
*. Not including $15,955 in capital gains from sale of cows, bulls, and bulk tank used in dairy operations.↩
3. See also section 1251, limiting the farm losses an individual with substantial nonfarm income may recognize, which was added to the Code by section 211 of the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 571. ↩
4. Example (4). The taxpayer inherited a farm of 65 acres from his parents when they died 6 years ago. The taxpayer moved to the farm from his house in a small nearby town, and he operates it in the same manner as his parents operated the farm before they died. The taxpayer is employed as a skilled machine operator in a nearby factory, for which he is paid approximately $8,500 per year. The farm has not been profitable for the past 15 years because of rising costs of operating farms in general, and because of the decline in the price of the produce of this farm in particular. The taxpayer consults the local agent of the State agricultural service from time-to-time, and the suggestions of the agent have generally been followed. The manner in which the farm is operated by the taxpayer is substantially similar to the manner in which farms of similar size, which grow similar crops in the area are operated. Many of these other farms do not make profits. The taxpayer does much of the required labor around the farm himself, such as fixing fences, planting crops, etc. The activity of farming could be found, based on all the facts and circumstances, to be engaged in by the taxpayer for profit.↩
5. See also Ong v. Commissioner, T.C. Memo. 1979-406↩. 6. Compare Wroblewski v. Commissioner, T.C. Memo. 1973-37↩, in which the taxpayer placed every cent he had into the purchase, operation, and improvement of his farm. When he ran out of money, he took on a temporary job. His farm was never profitable, but we found on that record that the taxpayer had a bona fide intention of making a profit. 7. See also Pickering v. Commissioner, T.C. Memo. 1979-243; Ballich v. Commissioner, T.C. Memo. 1978-497; Hurd v. Commissioner,T.C. Memo. 1978-113; Conyngham v. Commissioner, T.C. Memo. 1964-194↩.
8. Respondent has not challenged the amount of petitioners' farm deductions, only their character under section 183. We, therefore, do not concern ourselves with determining which, if any, of petitioners' expenditures might have been personal in character.↩